**In re MR. GATTI'S, INC., Debtor.**

**Bankruptcy No. 91–13460–LK.**

United States Bankruptcy Court,
W.D. Texas,
Austin Division.

Jan. 27, 1994.

Adrian M. Overstreet, Austin, TX, for Mr. Gatti's, Inc.

Eric Taube, Liddell, Sapp, Zivley, Hill & LaBoon, Austin, TX, for Mills.

## MEMORANDUM OPINION ON OBJECTION TO CLAIM OF JAMES B. MILLS, TRUSTEE AND KAREN D. MILLS

LARRY E. KELLY, Chief Judge.

Mr. Gatti's, Inc., ("Debtor") is a national franchisor of pizza restaurants. It filed a voluntary Chapter 11 petition on October 10, 1991. James B. Mills, Trustee and Karen D. Mills (hereafter collectively referred to as "claimant") are lessors of real property, whose previously unexpired lease was rejected in this case by the Debtor. Their proof of claim, as amended, seeks $97,200.00 in damages.[1] The court has jurisdiction over this contested matter pursuant to 28 U.S.C. § 1334 and it is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(B). This Memorandum Opinion contains the court's Findings of Fact and Conclusions of Law as required by Bankruptcy Rule 7052.

## BACKGROUND

The written lease in question was originally entered into between claimant, as lessor and Tumbleweed Foods, Inc., as lessee, on November 1, 1979. The term of the lease was for 20 years. On March 1, 1984, Tumbleweed Foods, Inc. assigned its interest in the lease to the Debtor. The lease contained a covenant obligating the lessee to pay rent, both through means of a fixed annual rent paid monthly and by means of a percentage rental obligation based upon a percentage of annual sales. Other covenants in the lease obligated the lessee to pay certain ad valorem taxes and utility charges to maintain insurance coverage, and to perform maintenance and repairs on the leasehold premises. The Lessor's rights upon default were likewise provided for. In addition to affording the lessor any remedy generally available at law, the lease specifically included the right of the lessor to (1) terminate the lease and recover damages; (2) perform any act which the lessee was required to do and recover the costs from the lessee; or (3) to recover possession of the premises, without termination of the lease, and to relet it to other persons.

The objection to the claim at issue was brought before the court for hearing on May 18, 1993. At that time the parties stipulated that, using the formula provided in § 502(b)(6), the "damages resulting from the termination of [the] lease ..." would amount to $47,571.00. The parties could not agree on whether "damages resulting from the termination of [the] lease ..." included damages from the Debtor's breach of the covenant to maintain and repair the leasehold premises. Here the Debtor argues that any damages attributable to its breach are already included in and capped by the allowance of the lessor's claim under § 502(b)(6). Claimants, however, assert that the repair

---

1. Their proof of claim was specially made subject to any post-petition administrative claim that claimant might have, which was to be asserted by separate pleadings in the case.

damages are not covered by the limitation contained within that section. After hearing the evidence and argument of the parties, the court made oral Findings of Fact and Conclusions of Law determining that the reasonable cost of repairs was $33,203.50 and that this sum represented the damage generally allowable to the claimant for the Debtor's breach of its repair covenant. The issue of whether or not this amount was included within the cap of § 502(b)(6) was reserved for further briefing and is now to be decided in this Memorandum Opinion.

## STATEMENT OF THE ISSUE

Succinctly stated, the question is whether or not all damage claims of a lessor, arising out of the lease agreement with the Debtors, are capped by § 502(b)(6) once the lease is rejected.

## DISCUSSION

■ Except for determining the dollar amount necessary to effectuate the repairs called for under the lease, no other facts were in dispute. The repair covenant in the lease provides:

> From and after commencement of the term of this lease, lessee shall, at its expense, maintain the Leased Premises and the improvements thereon, in the same condition in which they were received, reasonable wear and tear, depreciation, damage and loss covered by insurance excepted. Lessor shall not be called upon to make any improvements or repairs in or upon the Leased Premises during the term of the lease. Lessee shall care for the grounds on the property, including the regular mowing of grass, care of shrubs and general landscaping and will keep the parking areas, driveways and the whole of the property in a clean, neat and sanitary condition ...

The Assignment of Lease Agreement provided:

> Assignee [Mr. Gatti's, Inc.] hereby assumes and agrees to pay and perform each and every term, provision, and obligation

of assignor [Tumbleweed Foods, Inc.] and or Lessee or tenant under the lease from and after February 29, 1984 and to indemnify and hold assignor harmless for failure by assignee to do so.

The Debtor ceased operations and vacated the leased premises about four years prior to filing this bankruptcy case. The claimant performed no repairs prior to the bankruptcy being filed, and the Debtor performed only a few. This court has determined that the Debtor did breach its obligation to maintain and repair and determined the claimant's damage to be $33,203.50 attributable to that specific breach. So, the problem is no longer with the peculiar facts of the case. The only question left is how to interpret the Code as it affects the allowance of the Claimant's claims for breaches of the covenants under the lease.

In interpreting the Code, the place to begin is with the language at issue. The only section cited by any of the parties as being relevant to discussion was § 502(b)(6).[2] It provides:

> (b) Except as provided ...

> "if such claim is the claim of a lessor for damages resulting from the termination of a lease of real property, such claim exceeds—

> > (A) the rent reserved by such lease, without acceleration, for the greater of one year, or 15 percent, not to exceed three years, of the remaining term of such lease, following the earlier of—

> > (i) the date of the filing of the petition; and

> > (ii) the date on which such lessor repossessed, or the lessee surrendered, the leased property; plus

> > (B) any unpaid rent due under such lease, without acceleration, on the earlier of such dates;"

The court thinks that attention should also be paid to § 502(g) and § 365(g), which respectively provide:

---

2. As the Code was originally enacted, this provision was found at § 502(b)(7). After the 1984 amendments it was redesignated at § 502(b)(6).

For ease of reference, it will hereafter be referred to throughout this opinion as § 502(b)(6).

§ 502(g). "A claim arising from the rejection, under section 365 of this title or under a plan under chapter 9, 11, 12, or 13 of this title, of an executory contract or unexpired lease of the debtor that has not been assumed shall be determined, and shall be allowed under subsection (a), (b), or (c) of this section or disallowed under subsection (d) or (e) of this section, the same as if such claim had arisen before the date of the filing of the petition."

§ 365(g). "Except as provided in subsections (h)(2) and (i)(2) of this section, the rejection of an executory contract or unexpired lease of the debtor constitutes a breach of such contract or lease—

(1) if such contract or lease has not been assumed under this section or under a plan confirmed under chapter 9, 11, 12, or 13 of this title, immediately before the date of the filing of the petition; or

(2) if such contract or lease has been assumed under this section or under a plan confirmed under chapter 9, 11, 12, or 13 of this title—

(A) if before such rejection the case has not been converted under section 1112, 1307, or 1208 of this title, at the time of such rejection; or

(B) if before such rejection the case has been converted under section 1112, 1307, or 1208 of this title—

(i) immediately before the date of such conversion, if such contract or lease was assumed before such conversion; or

(ii) at the time of such rejection, if such contract or lease was assumed after such conversion."

Claimant asserts that the damages for repair were not "damages resulting from the termination of a lease of real property" and are therefore not subject to the cap of § 502(b)(6). Debtor argues, however, that there are only two types of claims with respect to a rejected lease of real property, unsecured claims which are capped in amount by § 502(b)(6), and administrative claims allowable under § 503.

Prior to the adoption of the Bankruptcy Code, allowance of a landlord's claim for damages once a lease of real property was rejected, was provided for in § 63a(9) of the Bankruptcy Act.[3] Section 63a(9) provided:

(9) claims for anticipatory breach of contracts, executory in whole or in part, including unexpired leases of real or personal property: Provided, however, that the claim of a landlord for damages for injury resulting from the rejection of an unexpired lease of real estate or for damages or indemnity under a covenant contained in such lease shall in no event be allowed in an amount exceeding the rent reserved by the lease, without acceleration, for the year next succeeding the date of the surrender . . .

Section 63(c) was also to have been read in conjunction with this provision, reading:

Notwithstanding any State law to the contrary, the rejection of an executory contract or unexpired lease, as provided in this Act, shall constitute a breach of such contract or lease as of the date of the filing of the petition in bankruptcy . . .

There is little dispute that prior to the adoption of the Bankruptcy Code, a landlord's claim for any damages resulting from the rejection of the lease by the Debtor, including any and all damages for breach of any covenants within the lease, were to be computed and then allowed within the limits of § 63a(9). This history of the predecessor provision is well stated in *Oldden v. Tonto Realty Corp.*, 143 F.2d 916 (2nd Cir.1944).

The language in § 502(b)(6), however, is not identical to that of its predecessor. Whereas § 63a(9) referred to damages resulting from "rejection", § 502(b)(6) refers to damages resulting from "termination". Also, § 63a(9) specifically referenced a landlord's claim for "damages or indemnity under a covenant *contained in such lease*" (emphasis added). Any references to covenants are entirely omitted in § 502(b)(6).

---

3. Sec. 77B, applying to corporate reorganizations, was amended at the same time that section 63 was, in 1934, and its amendment relating to the allowance of landlord's claims was substantially similar to section 63 sub. a(9), except that the limitation was extended to three year's rent.

Claimant argues that this omission as well as the use of the word "termination" as opposed to "rejection", compels a different interpretation under § 502(b)(6) than was required by its predecessor. In support of their argument they cite this court to *In re Atlantic Container Corp.*, 133 B.R. 980 (Bankr.N.D.Ill.1991). That court also looked to these two sections, recognized that a landlord's damage claims were capped under § 63a(9) but concluded that in light of the wording of § 502(b)(6) they were not necessarily capped under the Bankruptcy Code. In part, that court stated:

> For purposes of this case, it is sufficient to note that the phrase 'damages resulting from the termination of a lease' does not seem to contemplate the type of damages being sought here. The phrase suggests that § 502(b)(6) is intended to limit only those damages which the lessor would have avoided but for the lease termination. Any damages caused to the Premises by the Debtor's failure to fulfill its repair and maintenance obligations are unrelated to the termination of the lease. Supra at pgs. 987–988.

That court also concluded that both the formula for calculating the maximum allowable claim for termination damages as well as the history of the development of § 502(b)(6) "suggests" that the drafter's primary concern was with limiting "prospective damage claims". Thus the court concluded that:

> the repair damages here have nothing to do with the long-term nature of the leases. Subjecting these claims to the section 502(b)(6) limitation would deviate severely

from the real and reasonable expectations of the parties to the leases.... *Atlantic Container Corp.* at 988.

This Debtor, however, says that this Code section is in fact intended to operate as a limit, or cap, on the aggregate allowance of all of the landlord's claims rising from breach by rejection, just as its predecessor § 63a(9) did. First they refer the court to the legislative history.[4] They also note that the legislative history is supported by the commentary in Collier on Bankruptcy to the effect that § 502(b)(6) is intended to determine the entire allowed, unsecured claim of a landlord after rejection of a previously unexpired lease of real property.

However viewed, the allowable claim of a landlord for purposes of eligibility to share in the distribution of the debtor's assets is the rent reserved by the lease, without acceleration, for either one year or fifteen percent not to exceed three years of the remaining period of the lease following either the date the petition was filed by the lessee/debtor or the date on which the landlord took possession of the premises or the lessee surrendered the property, whichever is earlier. In addition, the landlord's allowable claim under the section is for any unaccelerated unpaid rent due under the lease on the earlier of the date of filing the petition or the date on which the landlord repossessed or the property was surrendered. But in all events, the burden is upon the landlord to show the damages resulting from the termination of the lease. *Upon such showing, the landlord's allowable claim is limited to the formula de-*

4. The relevant legislative history provides as follows:

> Paragraph (7) *derived from current law, limits the damages allowable to a landlord of the debtor.* The history of this provision is set out at length in *Oldden v. Tonto Realty Co.*, 143 F.2d 916 (2nd Cir.1944). It is designed to compensate the landlord for his loss while not permitting a claim so large (based on a long-term lease) as to prevent other general unsecured creditors from recovering a dividend from the estate. The damages a landlord may assert from termination of a lease are limited to the rent reserved for the greater of one year or ten percent of the remaining lease term, not to exceed three years, after the earlier of the date of the filing of the petition and the date of surrender or repossession. The

sliding scale formula is new, is designed to protect the long-term lessor, and is included as a replacement of the dual provisions in current law of a three-year test for reorganization cases and a one-year test for liquidation cases. This subsection does not apply to limit administrative expense claims for use of the leased premises to which the landlord is otherwise entitled. This paragraph will not overrule *Oldden* or the proposition for which it has been read to stand; to the extent that a landlord has a security deposit in excess of the amount of his claim allowed under this paragraph, the excess comes into the estate. *Moreover, his allowed claim is for his total damages, as limited by this paragraph....*" H.R. 95–595 to accompany H.R. 8200, 95th Cong. 1st Sess. (1977) pp. 353–355. (emphasis added).

scribed in § 502(b)(6)(A) and, under subparagraph (B) of that section, any unpaid rent which was due under the lease without acceleration, on the earlier of the dates described in subparagraph (A). 3 Collier on Bankruptcy, ¶ 502.02[7] pp. 502–61 to 63 (1993).

There is also substantial case authority which supports the Debtor's position. See, e.g., *In re Weeks*, 28 B.R. 958 (Bankr. W.D.Okla.1983) ("... by enacting [section 503(b)(6)] Congress has set mandatory limitations on the claim of a landlord for damages resulting from termination of a lease of real property."); *In re Storage Technology*, 77 B.R. 824 (Bankr.D.Colo.1987) ("This language [referring to § 502(b)(6)] does not qualify or in any way limit the type of damages involved. The damage cap applies to all damages, which are then arbitrarily capped and measured by rent reserved. Such a cap has been in the bankruptcy law for many years [citing § 63a(9) and *Oldden v. Tonto Realty Corp.*] ... Thus, as a matter of law, the actual damage claim of the [landlord] for termination of the lease, whether for nonpayment of rent, taxes, costs, attorney's fees, or other financial covenants, are limited by the damage cap in § 502(b)(6)(A)"); *Bel–Ken Associates Limited Partnership v. Clark*, 83 B.R. 357, 358 (D.Md.1988) ("... Section 502(b)(6) sets a limitation on a landlord's claim against a bankrupt-lessee's obligation under a lease of real property. This limitation, or cap, comes into play once the bankruptcy trustee rejects the lease ..."); and *In re Communicall Cent., Inc.*, 106 B.R. 540, 543 (Bankr.N.D.Ill.1989) ("If an unexpired lease is rejected after the commencement of a case, it gives rise to a claim for damages sustained by the landlord ... The allowable amount for claims for damages resulting from rejection of same is limited by the provisions contained in § 502(b)(6)."); and *In re Emple Knitting Mills, Inc.*, 123 B.R. 688, 690 (Bankr.D.Me.1991) ("We find the decisional authorities to uniformally hold that the Code limits a lessor's claim against the bankruptcy estate following rejection ...").

One of the wiser things that the court in *Atlantic Corp.* did was to decline to enter into the debate on whether the "plain mean-ing" of a statute always controls and whether "legislative intent" is a myth. *Atlantic Container Corp.* at 987. This court recognizes that trying to divine a clear path through the rules stated in the U.S. Supreme Court opinions dealing with bankruptcy cases over the past several years is difficult. Justice Scalia, in his dissent in *Dewsnup v. Timm*, — U.S. ——, 112 S.Ct. 773, 116 L.Ed.2d 903, expressed his sympathy for Courts of Appeals which must predict which manner of statutory construction that the Supreme Court would use in its next Bankruptcy Code case. However it is not just the Courts of Appeals that have to struggle with this issue.

■■■ The principal rules of construction would appear to be as follows. Briefly stated, the normal inquiry into the meaning of the statute begins with the language of the statute itself and, absent some ambiguity, the language of a statute should be interpreted according to its "plain meaning" and without reference to legislative history or case law. *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989). The fact that Congress may not have foreseen all of the consequences of a statutory enactment is not a sufficient reason for refusing to give effect to its plain meaning. *Toibb v. Radloff*, 501 U.S. 157, 111 S.Ct. 2197, 115 L.Ed.2d 145 (1991). An exception to the plain meaning rule has sometimes been applied, however, where the "literal application of a statute will produce a result demonstrably at odds with the intention of its drafters." *Ron Pair*, 489 U.S. at 242, 109 S.Ct. at 1031 (citing *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982)). In such cases, the intention of the drafters rather than the strict language controls. In addition to these words of guidance, the Supreme Court has also recognized that when Congress amends the bankruptcy laws, it does not write on a clean slate. Therefore the Supreme Court has been "reluctant to accept arguments that would interpret the Code, however vague the particular language under consideration might be, to effect a major change in pre-Code practice if it is not the subject of at least some discussion in the legislative history." *Dewsnup v. Timm*, — U.S. at ——, 112 S.Ct. at 779, citing *United*

*Savings Association of Texas v. Timbers of Inwood Forest Associates, Ltd.,* 484 U.S. 365, 380, 108 S.Ct. 626, 634, 98 L.Ed.2d 740 (1988); *Pennsylvania Dept. of Public Welfare v. Davenport,* 495 U.S. 552, 571, 110 S.Ct. 2126, 2138, 109 L.Ed.2d 588 (1990); *United States v. Ron Pair Enterprises Inc.,* 489 U.S. 235, 244–245, 109 S.Ct. 1026, 1032–1033, 103 L.Ed.2d 290 (1989).

Given these less than clear boundary markers and surveying tools, this court ventures forth. It appears necessary to first determine the "plain meaning" of § 502(b)(6), if possible. If it is subject to more than one "clear meaning", then it may be ambiguous and resort to legislative history may be required. The interpretation difficulty appears to be with the phrase "for damages resulting from the termination of a lease of real property." As already noted, this is because the word "termination" was not found in predecessor § 63a(9), which used the term "rejection". It is also in part because § 365(g) provides that "rejection ... constitutes a breach of such ... lease" as opposed to stating that it constitutes a "termination" of the lease.

 The analysis may not really be all that complex, however. It seems to this court that when a debtor files bankruptcy, any interest that it has in an unexpired lease of real property would certainly become property of the estate. 11 U.S.C. § 541. The estate, acting through the debtor in possession or the trustee, then has two options—it may assume the lease or it may reject the lease. 11 U.S.C. § 365(a). Although the deadline set out by the Code for making this decision may be modified, ultimately assumption or rejection must occur. Assumption generally means that the estate is then legally committed to perform all of its obligations under the lease. *Matter of Braniff Airways, Inc.,* 783 F.2d 1283, 1285 (5th Cir.1986) ("If the trustee assumes the lease, the debtor's estate becomes liable for the full rent accruing under the terms of the lease.") (cite omitted). Once assumed, the landlord is no longer faced with a possible breach and does not file a proof of claim against the estate for pre-petition damages. Subsequent non-performance by the assuming bankrupt-

cy estate could result, however, in an application for payment of an administrative claim under § 503. It is only where the bankruptcy estate rejects its obligation to perform any further under an unexpired lease of real property that the landlord becomes entitled to file a proof of claim. See generally, Collier on Bankruptcy (15th Ed.1986). As the Second Circuit observed in *In re P.C.H. Associates,* 804 F.2d 193, 199 (2nd Cir.1986), §§ 365(d)(3), 365(d)(4) and 502(b)(6) when "read together", are part of a total scheme designed to set forth the rights and obligations of landlords and tenants involved in bankruptcy proceedings. In accord, see *Moreggia & Sons, Inc.,* 852 F.2d 1179, 1182 (9th Cir.1988). Once properly rejected, the estate then no longer has the option to assume the previously unexpired lease of real property. A landlord might be willing to "waive" the rejection or to allow the former lease to "continue in effect" between the parties, but this is really not assumption. It would be a "new agreement" incorporating or agreeing to abide by the old terms.

 It is also obvious that rejection of a lease is not done piecemeal, but results in rejection of the lease as a whole. Either "the lease" is assumed or "the lease" is rejected. 11 U.S.C. § 365(a). Rejection by the debtor is a breach of each and every provision of the lease and is, for all practical purposes, a "termination" by the debtor of the estate's obligation to perform. Whether the debtor's rejection is a "termination" for all legal purposes under the Code is not what § 502 is specifically dealing with. Section 502 deals only with allowance by a landlord of a claim, if presented, against the bankruptcy estate. However, a clear majority of courts which have looked at the effect of rejection do conclude that it results in actual termination of the lease. See, e.g., *Sea Harvest Corp. v. Riviera Land Co.,* 868 F.2d 1077 (9th Cir.1989) (deemed rejection and surrender requirement had effect of terminating lease); *In re Mead,* 28 B.R. 1000 (E.D.Pa. 1983); *In Re O.P.M. Leasing Services, Inc.,* 30 B.R. 642 (Bankr.S.D.N.Y.1983); *In Re Hawaii Dimensions, Inc.,* 39 B.R. 606 (Bankr.D.Haw.1984), affirmed 47 B.R. 425 (D.Haw.1985); *In re Tacoma Boatbuilding*

*Co.,* 81 B.R. 248 (Bankr.S.D.N.Y.1987); *In re Southern Motel Associates,* 81 B.R. 112 (Bankr.M.D.Fla.1987); *In re Gillis,* 92 B.R. 461 (Bankr.D.Haw.1988); *In re Giles Associates, Ltd.,* 92 B.R. 695 (Bankr.W.D.Tex.1988); *In re Stalter & Co. Ltd.,* 99 B.R. 327 (Bankr. E.D.La.1989); *In re Child World, Inc.,* 142 B.R. 87 (Bankr.S.D.N.Y.1992); and *In re 6177 Realty Associates, Inc.,* 142 B.R. 1017 (Bankr.S.D.Fla.1992). See also 390 PLI/Real 151, *Leasehold Mortgages and Bankruptcy: Look Before You Leasehold.* This article discusses a landlord's remedies after rejection of the lease of real property in bankruptcy and states:

> · [I]t is apparent, and acknowledged by almost every court writing on the subject that there is a split of authority concerning the status of either a ground lease or security interest therein once the lessee rejects the lease. However, the overwhelming majority of courts faced with the specific question of whether a mortgagee's interest is terminated by the rejection of a ground lease under Code § 365 have held that rejection equals termination. (cites omitted).

Some cases do hold to the contrary, see e.g., *In re Storage Technology Corp.,* 53 B.R. 471 (Bankr.D.Colo.1985); *In re Picnic 'N Chicken, Inc.,* 58 B.R. 523 (Bankr.S.D.Cal.1986) (decided prior to the Ninth Circuit decision in *Sea Harvest Corp.*); and *Matter of Garfinkle,* 577 F.2d 901 (5th Cir.1978) (decided under the Bankruptcy Act).

■ Common sense also tells this court that a lessor's "damages" are not "caused" by technical termination of a lease in any event. Damages are "caused" by a tenant's actual non-performance of its obligations. When a debtor "rejects" a lease, the debtor is rejecting its future performance of all of the covenants contained within the lease. This rejection includes its obligation to pay rent, common area maintenance, expenses, taxes, utility charges or to perform services such as maintenance and repair obligations. In a very real and practical sense, rejection is a "termination" by the debtor of the lease. This rejection effectuates a breach of each of the lease covenants as shown by § 365(g) and that breach is what authorizes a landlord to file a proof of claim for damages. When one considers the context in which termination of the lease is being used, and the fact that structurally it is being used in a Code section that defines the landlord's rights only when the landlord is filing a proof of claim against the bankruptcy estate because of the rejection of a previously unexpired lease of real property, "termination" is not incompatible with the prior effect of rejection under § 63a(9). In a very real sense, the "plain meaning", taken structurally and in context, is that the lease is being terminated for the purpose of affording the landlord a breach-of-contract claim for damages suffered because of the future non-performance by the tenant-debtor of the covenants in the lease.

One court that does not believe that rejection equates with termination, has also read § 502(b)(6) this same way. *In re Emple Knitting Mills, Inc.,* 123 B.R. 688 (Bankr. D.Me.1991). In that case, the trustee had rejected a lease and argued that rejection operated to terminate the lease. The landlord argued that rejection was merely a breach and that its rent was not completely capped by § 502(b)(6). The opinion recognized the "plain meaning rule" of statutory analysis and determined that rejection was not deemed to have terminated the lease. The court however found that such interpretation did not change the outcome from court decisions that decided rejection did effectuate a termination. It reached this conclusion by recognizing that § 502(b)(6) is dealing only with claims by a lessor "against the estate" in bankruptcy.

> Although it is not specifically stated, we believe that the clear implication to be drawn from the foregoing decisions [cases holding that rejection of the lease did not by itself terminate the lease] is that the Trustee's rejection of an unexpired lease *restricts the lessor's recovery against the estate* to a damage claim based upon breach of contract, which claim is subject to the limitation contained in § 502(b)(6). Citing *F.E. Schwartz v. C.M.S., Inc. (In re Communicall Cent., Inc.,* 106 B.R. 540, 543 (Bankr.N.D.Ill.1989). (emphasis added) (citations and quotations omitted).

Accordingly, we hold that once the lease is rejected, the lessor's *claim against the estate is limited to one for damages for breach of contract* ... [t]hus the lessor has the choice of: (1) not terminating the lease and seeking payment of future rents from "the tenant" or from any person or entity that has guaranteed the debtor's lease obligations; or (2) to terminate the lease and file a claim in the bankruptcy estate for damages, which claim will be subject to the § 502(b)(6) limitation. (emphasis added). *Emple Knitting Mills,* at 691.

Thus, if the vast majority of reported opinions are correct, rejection is equated to termination and § 502(b)(6) is therefore effectively synonymous with its predecessor, § 63a(9). This analysis would certainly comport with Congressional intent as evidenced by the legislative history referenced earlier. However, if rejection does not necessarily equate with "termination" for all purposes, *Emple Knitting Mills* shows that the practical effect is still within the plain meaning rule of statutory analysis. The lessor's claim, if filed, will be for "termination damages". *Emple,* at 691.[5]

In the alternative, this court would reluctantly have to find that "termination" is subject to different but reasonable interpretations as used in § 502(b)(6). One interpretation would be that the lease itself is terminated by rejection, with the same effect as if the landlord had elected to terminate because of the debtor's anticipatory breach. A second meaning, for the purposes of determining what a landlord is entitled to assert by way of a claim against a bankruptcy estate where the previously unexpired lease of real property has been rejected, would allow the landlord to assert a damage claim the same as if

the lease had been terminated even if it may not be terminated for all purposes. A third meaning, as found by *Atlantic Container Corp.,* is that only longterm prospective damages which cannot be avoided because of termination are encompassed within the statutory cap of § 502(b)(6), while other damages, not caused by termination, may be added to the landlord's claim and not be limited by the cap. In this court's view, to ignore the cap would be a drastic change from well established bankruptcy law as it existed prior to the enactment of § 502(b)(6). Therefore, the exception to the plain meaning rule would be called for, as it is apparent from a review of the legislative history that it would be at odds with the intent of the drafters to interpret the statute without a cap. This court therefore rejects such interpretation.

## FINDINGS OF FACT

1. This court accepts the stipulations of the parties that $47,571.00 is the amount of the allowable claim of claimant for lease rejection damages as limited by § 502(b)(6);

2. The sum of $33,203.50 is the reasonable cost necessary to meet the Debtor's maintenance and repair obligations under the lease at issue, and this sum represents the amount that the landlord has been damaged by reason of the Debtor's breach of this specific covenant.

## CONCLUSIONS OF LAW

Section 502(b)(6) limits a landlord's claim against the bankruptcy estate once a debtor rejects a previously unexpired lease of real property. Under the facts of this case, the damages suffered by the landlord because

---

5. In Texas, upon breach by a tenant, the landlord generally has four common law remedies: (1) the landlord may decline to repossess the property, electing instead to maintain the lease in full force and effect and thereby being allowed to sue on the contract for the rent as it becomes due and to recover the contractual rent; (2) the landlord may treat the tenant's conduct as an anticipatory breach and repossess and retain the property for his own purposes, thus being permitted to recover the present value of the rentals that accrue under the lease contract, reduced by the reasonable cash market value of the lease for the unexpired term; (3) the landlord may treat the tenant's conduct as an anticipatory breach, repossess the property and lease it to a new tenant, recovering the contract rental reduced by the amount to be received from the new tenant; or (4) the landlord may declare the lease forfeited, relieving the tenant of any liability for future rental payments. *Speedee Mart, Inc. v. Stovall,* 664 S.W.2d 174, 176–177 (Tex.Civ.App.—Amarillo 1983 no writ history). As in *Emple,* the practical effect of rejection, if the landlord wishes to pursue a claim against the estate, is to treat the lease as "terminated" between landlord and tenant and file a claim for damages for the tenant's breach of each of the covenants.

the Debtor's rejection of the lease and failure to perform, including its failure to perform its maintenance and repair obligations, are allowable, but are capped in the amount of $47,571.00 as the claim to be allowed against the bankruptcy estate.

IT IS SO ORDERED.