In the Matter of John N.
VANZANDT, Debtor.

No. 02–01078–LMJ13.

United States Bankruptcy Court,
S.D. Iowa.

April 2, 2004.

Richard R. Schlegel, II, Ottumwa, Iowa, for Debtor.

Elizabeth E. Goodman, Des Moines, Iowa, for Chapter 13 Trustee.

Verle W. Norris, Corydon, Iowa, for Lehigh Clay Properties, Ltd.

## MEMORANDUM OF DECISION

LEE M. JACKWIG, Chief Judge.

Chapter 13 Debtor John N. VanZandt ("Debtor") objects to the proof of claim filed by his former lessor, Lehigh Clay Properties, Ltd., ("Creditor"). Having conducted an evidentiary hearing on the claim controversy and having reviewed the written arguments of the parties, the Court now enters its decision allowing Creditor an unsecured nonpriority claim in the amount of $8,704.85.

The Court has jurisdiction of this matter pursuant to 28 U.S.C. section 1334 and the standing order of reference entered by the United States District Court for the Southern District of Iowa. This is a core matter under 28 U.S.C. section 157(b)(2)(B).

## BACKGROUND

On or about May 3, 2001, Debtor and Creditor entered into a Dwelling Unit Rental Agreement (a standard form issued by the state bar association) for a term beginning May 1, 2001 and ending April 30, 2004. Debtor agreed to pay $300.00 per month for the dwelling unit and $350.00 per month for 15.2 acres of adjacent farmland. The $650.00 rent was due on the first of every month. As long as Debtor remained current in his rent payments over the term of the lease, he could renew the lease for the same amount of rent for as long as he lived. A typewritten edit on the standard form indicated that Debtor was responsible for all maintenance. To that portion of the agreement, Debtor wrote and both parties initialed: "The property to be left in the same if not better condition as when the tenant took control." (Exhibit 1 at 3.) Another initialed handwritten edit deleted the reference to a security deposit. According to one of the additional provisions typed at the end of the agreement, Creditor was responsible for the furnace repair and maintenance.

Richard McHose, who signed the agreement on behalf of Creditor, testified that Creditor purchased the property from another individual in order to rent it to Debtor on a long term basis. Creditor agreed to the fixed rent amount because of Debtor's willingness to take care of the maintenance and to pay the annual property tax in monthly installments. With respect to the latter, Debtor paid a reduced amount until April 1, 2002 because 8.71 tillable acres of the 15.2 acres of farmland had already been rented to another individual at the time Debtor and Creditor entered into their lease. Debtor later questioned why he was paying rent for acres he could not use, and Creditor subsequently gave him a credit of $552.00.

Debtor, a retired veterinarian, testified that he moved into the property knowing that the house needed various repairs and that not all of the leased acres would be immediately available for him to use for his sheep and donkeys. Apparently he was under the impression that there were maintenance problems Creditor agreed to resolve despite the maintenance provisions in the lease agreement. A letter Mr. McHose wrote to Debtor, at or about the time the lease agreement was executed, does indicate Debtor could "deduct" the cost of certain repairs from the amount of rent he would owe. (Exhibit 8 at 2.)

Debtor described a number of maintenance issues that were unresolved over the course of the time he resided on the premises. In particular, he noted the furnace was not working properly in December 2001. On cross-examination, Debtor ac-

knowledged he did not provide Creditor with any written notice of his complaints. Instead, sometime in late 2001 or early 2002, he hired an attorney to handle the matter for him. Debtor ceased paying rent in the new year.

In a letter dated January 6, 2002, Mr. McHose advised Debtor that the January rent was due and that he also owed a $25.00 late fee. Among other observations, Mr. McHose stated: "Per the lease I was really only responsible for the furnace, but to appease you I have done much much more. I am through appeasing you, and per the lease you are responsible for what ever [sic] else you need to have done." (Exhibit 9 at 2.)

On February 4, 2002 Creditor served Debtor with a three-day notice to quit the premises and with what purported to be a three-day notice to cure. Debtor did not leave the property. On March 1, 2002 Creditor filed a petition for forcible entry and detainer in the Iowa District Court in and for Wayne County. The action was scheduled to be heard on March 8, 2002.

On March 6, 2002 Debtor filed a petition for relief commencing this Chapter 13 case. He filed his schedules, statements and plan on the same day. On Schedule G (Executory Contracts and Unexpired Leases), he listed Creditor and indicated the remaining two year lease would be rejected. In response to paragraph 4 in the Statement of Financial Affairs, Debtor answered in the negative regarding being a party to any lawsuits within one year immediately preceding the petition date. In his 60–month plan, Debtor indicated he was rejecting the lease with Creditor but set forth no amount to cover any claim resulting from the rejection.

On March 8, 2002 the state court conducted the hearing on Creditor's petition for forcible entry and detainer. Noting that Creditor's attorney was present and that Debtor "received notice to quit on February 4, 2002" and "was further served with notice of hearing on this action on March 3, 2002," the state court ordered that execution for possession by Creditor issue immediately on March 24, 2002 if Debtor did not vacate the premises completely in the interim. (Exhibit 3 at 9.) The court also awarded Creditor a judgment for the costs of the action, including any costs that would accrue upon a writ of execution. Debtor, however, did leave the property on or before March 23, 2002.

On March 28, 2002 the Chapter 13 trustee filed an objection to the plan. It was a placeholder objection pending the outcome of the 11 U.S.C. section 341 meeting of creditors. No other party in interest filed an objection to the plan. The trustee withdrew his objection on May 7, 2002, and the Court entered an order confirming the plan on May 9, 2002.

Meanwhile, on April 3, 2002, Creditor filed a Proof of Claim (Official Form B10) indicating it held an unsecured claim in the amount of $24,275.00 for a breach of lease. No supporting documentation accompanied the form. On June 20, 2002 Debtor filed an objection to the claim. He asked the Court to disallow the claim on the following grounds:

> Debtor has rejected this lease in the Chapter 13 Plan. No one representing Lehigh Clay Properties has filed an objection to said Plan and the Plan has been confirmed. Therefore, the rejection of the lease is deemed complete and as such the creditor is not entitled to recover under the terms of said lease. The amount set forth due in the claim is for future payment under the lease. The creditor has made no attempt to mitigate damages. The creditor is also in default on the lease, breach of the lease and several particulars with [sic] may give rise to a claim by debtor

against creditor. For all of these reasons, this objection is lodged against the claim filed herein.

(Docket No. 20 at 1.)

On July 5, 2002 Creditor filed an objection in opposition to Debtor's objection. Creditor maintained that: Debtor breached the lease prepetition; the claim was "based on damages to said leased premises, unpaid rent at the time of the Debtor's abandonment of the property, and damages associated with Debtor's breach of said lease agreement"; and allowance of the claim was not dependent upon assumption of "the underlying real estate contract." (Docket No. 22 at 1–2.) No specific dollar amount was attributed to any component of the claim.

After conducting a preliminary telephonic hearing on the controversy on August 20, 2002, the Court entered an order directing Creditor to submit documentation in support of its proof of claim by September 3, 2002. In response, Creditor timely filed Exhibits 1 ("Lease Agreement"), 2 ("Notice to Quit and Return of Service"), 3 ("Petition for Forcible Entry and Detainer, Order for Hearing and Order for Possession"), 4 ("Invoices for Repairs to Property"), and 5 ("Summary of Expenses"). (Docket No. 27.) In the August 20, 2002 order, the Court also directed the parties to file a stipulation of facts and their respective briefs by September 30, 2002. The parties timely filed their written arguments. Creditor also submitted supplemental Exhibits 6 ("Statement of Sherry Spring"), 7 ("Letter of Dick McHose to Debtor"), 8 ("Letter from Dick McHose to Debtor"), 9 ("Letter dated January 6, 2002, from Dick McHose to Debtor"), and 10 ("Letter dated January 9, 2002, from Verle W. Norris to Richard R. Schlegel, II"). (Docket No. 29.) The parties, however, did not file a stipulation of facts. Accordingly, the Court scheduled the controversy for an evidentiary hearing on November 15, 2002. At that time, Creditor offered Exhibits 1 through 5 and Exhibits 7 through 10. The Court admitted Exhibits 1 through 3 and Exhibits 7 through 9 into evidence.

In addition to the testimony discussed earlier, Mr. McHose testified that the premises were in poor condition when Debtor vacated the property in late March 2002. Nevertheless, Creditor was able to lease the house and the tillable acres of the farmland to an individual by the name of Chad King the very next month. However, with respect to revenue flow, Mr. McHose stated Creditor had suffered and would suffer a loss for what would have been the remainder of the term of the lease with Debtor. Mr. McHose explained that the lease arrangement with Mr. King was that he paid no house rent for the first month, then $250.00 per month for the next three months, and then $350.00 per month for the remainder of the lease term. In addition, Mr. King would pay a separate annual amount of $983.00 for the tillable acres. That meant, instead of receiving $8,487.00 from Debtor in year 2002 and 2003,[1] Creditor would receive $3,483.00 from Mr. King in 2002[2] and $5,183.00 in 2003.[3] That equaled respective annual losses of $5,004.00 and $3,304.00.[4] As for

---

1. $7,800.00 house and farmland rent ($650.00 × 12 months) + $687.00 property taxes ($57.25 × 12 months) = $8,487.00.

2. $750.00 house rent ($250.00 × 3 months) + $1,750.00 house rent ($350.00 × 5 months) + $983.00 (tillable acres annual rent) = $3,483.00.

3. $4,200.00 house rent ($350.00 × 12 months) + $983.00 (tillable acres annual rent) = $5,183.00.

4. $8,487.00—$3,483.00 = $5,004.00; $8,487.00—$5,183.00 = $3,304.00

2004, instead of receiving $2,829.00 from Debtor,[5] Creditor would receive $1,727.00 from Mr. King.[6] That equaled a loss of $1,102.00.[7] Hence, under that analysis, Creditor's total loss in future revenue would be $9,410.00.[8]

## DISCUSSION

I. Status of the Lease Agreement as of the Petition Date.

Debtor contends the lease agreement was unexpired when he filed his petition for relief on March 6, 2002. Creditor contends the lease terminated on February 7, 2002 because Debtor did not pay overdue rent within three days of February 4, 2002, the date on which Creditor served Debtor with a notice to quit pursuant to Iowa Code section 648.3 and a notice pursuant· to Iowa Code section 562A.27.

■ If a landlord has already "given a tenant three days' notice to pay rent and has terminated the tenancy as provided in section 562A.27, subsection 2," the landlord need not give that tenant three days' notice to quit before commencing a forcible entry and detainer action. Iowa Code § 648.3. "[W]ritten notice to cure in compliance with section 562A.27(2) is a condition precedent to the landlord's termination of a rental agreement in the case of a residential lease." *Symonds v. Green*, 493 N.W.2d 801, 803 (Iowa 1992). With respect to the essence of a notice to cure, section 562A.27(2) provides:

> If rent is unpaid when due and the tenant fails to pay rent within three days after written notice by the landlord of nonpayment and the landlord's inten-

tion to terminate the rental agreement if the rent is not paid within that period of time, the landlord may terminate the rental agreement.

Iowa Code § 562A.27(2).

In this case, the notice to cure appears to be a document prepared by Creditor. It is captioned "NOTICE PURSUANT TO IOWA CODE SECTION 562A.27," and the main text reads:

> YOU ARE HEREBY NOTIFIED pursuant to Iowa Code Section 562A.27 that you have failed to pay rent or vacate the premises as per a notice of termination.
>
> YOU ARE FURTHER NOTIFIED that your lease of this property will terminate within three (3) days of receipt of this NOTICE. The total amount of rent due is $650.00.
>
> TAKE NOTICE AND GOVERN YOURSELF ACCORDINGLY.

(Exhibit 2 at 2.) The notice to quit (a standard form issued by the state bar association) simply advised Debtor that Creditor demanded he vacate the premises within three days of service of the notice "for the reason that you have failed to pay the rent for said premises when due." (Exhibit 2 at 1.)

■ Though there appears to be no prohibition against serving a notice to cure with a notice to quit, one of the notices must advise the tenant of the nonpayment and of the landlord's intent to terminate the lease if the nonpayment is not cured within three days of receipt of such notice. Other omissions do not deprive the state court of jurisdiction to hear the forcible

---

5. $2,600.00 house and farmland rent ($650.00 × 4 months) + $229.00 property taxes ($57.25 × 4 months) = $2,829.00.

6. $1,400.00 house rent ($350.00 × 4 months) + $327.00 (1/3 of the $983.00 tillable acres annual rent) = $1,727.00.

7. $2,829.00—$1,727.00 = $1,102.00.

8. $5,004.00 + $3,304.00 + $1,102.00 = $9,410.00.

entry and detainer action. *Compare Garrison v. Fetters*, 383 N.W.2d 550, 553 (Iowa 1986) (finding notice to cure, filed with notice to quit, complied with Iowa Code section 562A.27(2) even though notice did not specify amount of rent due or the date when due) *with Symonds*, 493 N.W.2d at 803 (finding notice to quit, served instead of a notice to cure, substantially prejudiced tenant's rights because it did not inform the tenant that paying the rent would remedy the defect and moot termination of the lease).

■ The notice to cure in issue is not labeled as a "notice to cure." Nothing in the notice advised Debtor that he could prevent the lease from being terminated by paying the rent that was due. Likewise, the notice to quit in issue does not contain that specific information. In sum, neither the notice to cure nor the notice to quit terminated the lease.

■ Parenthetically, the Court observes that the record does not indicate that the state court made any finding on this issue when it heard and ruled on Creditor's forcible entry and detainer action on March 8, 2002—two days after Debtor sought relief in this forum. In any event, the state court order was void ab initio as a result of 11 U.S.C. section 362(a)(1).[9] *LaBarge v. Vierkant (In re Vierkant)*, 240 B.R. 317 (8th Cir. BAP 1999).

## II. Effect of Rejection of Unexpired Lease.

Due in part to the disagreement over the status of the lease at the time the bankruptcy case was commenced, the parties' arguments with respect to the effect of Debtor's rejection of the unexpired lease are somewhat difficult to decipher. The Court interprets Debtor's position to be that he owes Creditor nothing unless the Court finds that he did breach the lease prepetition. Similarly, the Court construes Creditor's counter stance to be that title 11 of the United States Code applies only if the lease did not terminate prepetition and then it applies only to a limited extent.

■ Since the lease was unexpired at the time Debtor filed his petition for relief, Debtor could reject the lease under the terms of his Chapter 13 plan. 11 U.S.C. § 1322(b)(7).[10] The lease rejection provision in the confirmed plan binds the Debtor and the Creditor. 11 U.S.C. § 1327(a).[11] Debtor's rejection of the unexpired lease under the terms of the

---

**9.** 11 U.S.C. section 362(a) provides in relevant part:

(a) Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title, or an application filed under section 5(a)(3) of the Securities Investor Protection Act of 1970, operates as a stay, applicable to all entities, of—

(1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title.

11 U.S.C. § 362(a).

**10.** 11 U.S.C. section 1322(b)(7) states that: "Subject to subsections (a) and (c) of this section, the plan may—.... (7) subject to section 365 of this title, provide for the assumption, rejection, or assignment of any ... unexpired lease of the debtor not previously rejected under such section."

**11.** 11 U.S.C. section 1327(a) provides that: "The provisions of a confirmed plan bind the debtor and each creditor, whether or not the claim of such creditor is provided for by the plan, and whether or not such creditor has objected to, has accepted, or has rejected the plan."

confirmed plan constitutes a breach of that lease immediately before the date of the filing of the petition. 11 U.S.C. § 365(g)(1).[12] Any resultant claim Creditor may hold is treated as if it had arisen before the date Debtor filed his petition for relief. 11 U.S.C. § 502(g).[13]

### III. Amount and Allowance of Creditor's Claim.

In his post-hearing brief, Debtor argues that any claim Creditor is allowed should be limited to rent due and reserved as of the petition date, minus amounts received from reletting the premises. In its written arguments, Creditor contends that it is entitled to unpaid rent, future rent minus amounts received from the new tenant, and costs incurred in repairing the damage Debtor caused to the premises.

 Had no one objected to Creditor's proof of claim, it would have been deemed allowed by operation of 11 U.S.C. section 502(a).[14] Since Debtor did object, determination of the claim proceeds under 11 U.S.C. section 502(b).[15] That section provides in relevant part:

> [I]f such objection to a claim is made, the court, after notice and a hearing,

shall determine the amount of such claim as of the date of the filing of the petition, and shall allow such claim in lawful currency of the United States in such amount, except to the extent that—

> . . . .
>
> (1) such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured;
>
> . . . .
>
> (6) if such claim is the claim of a lessor for damages resulting from the termination of a lease of real property, such claim exceeds—
>
> > (A) the rent reserved by such lease, without acceleration, for the greater of one year, or 15 percent, not to exceed three years, of the remaining term of such lease, following the earlier of—
> >
> > > (i) the date of the filing of the petition; and
> > >
> > > (ii) the date on which such lessor repossessed, or the lessee surrendered, the leased property; plus

---

**12.** 11 U.S.C. section 365(g)(1) states that:

> Except as provided in subsections (h)(2) and (i)(2) of this section, the rejection of an executory contract or unexpired lease of the debtor constitutes a breach of such contract or lease-
> > (1) if such contract or lease has not been assumed under this section or under a plan confirmed under chapter 9, 11, 12, or 13 of this title, immediately before the date of the filing of the petition; . . . .
>
> 11 U.S.C. § 365(g)(1).

**13.** 11 U.S.C. section 502(g) provides:

> A claim arising from the rejection, under section 365 of this title or under a plan under chapter 9, 11, 12, or 13 of this title, of an executory contract or unexpired lease of the debtor that has not been assumed

shall be determined, and shall be allowed under subsection (a), (b), or (c) of this section or disallowed under subsection (d) or (e) of this section, the same as if such claim had arisen before the date of the filing of the petition.

11 U.S.C. § 502(g).

**14.** 11 U.S.C. section 502(a) states that: "A claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest, including a creditor of a general partner in a partnership that is a debtor in a case under chapter 7 of this title, objects."

**15.** In addition to subsection (a) of 11 U.S.C. section 502, subsections (c), (d) and (e) are not applicable here. *See* 11 U.S.C. § 502(g) quoted *supra* note 13.

(B) any unpaid rent due under such lease, without acceleration, on the earlier of such dates.

11 U.S.C. § 502(b).[16] With respect to a lessor's damages, the "[f]ederal law does not provide a formula for ascertainment of a lessor's allowable damages. Rather, it merely qualifies and limits the claim to a maximum." *Schwartz v. C.M.C. Inc. (Communicall Central, Inc.)*, 106 B.R. 540, 543 (Bankr.N.D.Ill.1989).

## A. Determination of Creditor's Claim

 Subject to a qualifying or a contrary provision in the Bankruptcy Code, state law generally governs the determination of a creditor's claim in a bankruptcy case if state law is the substantive law under which the debtor's obligation arose. *Raleigh v. Illinois Department of Revenue*, 530 U.S. 15, 120 S.Ct. 1951, 147 L.Ed.2d 13 (2000). As for the burden of proof, it "is an essential element of the claim itself; one who asserts a claim is entitled to the burden of proof that normally comes with it." *Raleigh*, 530 U.S. at 21, 120 S.Ct at 1955. Hence, although a properly executed and filed proof of claim is prima facie evidence of both the validity and the amount of the claim,[17] any allocation of the burdens of proof and persuasion must be consistent with the law under which the claim arises.

With respect to the claim in issue, Iowa Code section 562A.32 states: "If the rental agreement is terminated, the landlord may have a claim for possession and for rent and a separate claim for actual damages for breach of the rental agreement and reasonable attorney's fees as provided in section 562A.27."

## The Claim for Rent

 Iowa Code section 562A.6(9) defines "rent" as "a payment to be made to the landlord under the rental agreement." The lease agreement in issue provided that Debtor would pay Creditor $650.00 for use of the house and the farmland. The parties also agreed that Debtor would pay Creditor amounts due for insurance and taxes. Rent was due on the first of every month. Delinquent rent was subject to interest at 11% per annum and to a $25.00 late fee.

The parties agree that Debtor did not pay rent for the house and farmland in January, February and March of 2002. The parties also agree that he did not pay one-twelfth of the property taxes due and owing in each of those months.[18] The record is silent regarding any unpaid amount for insurance. Hence, as of March 6, 2002, Creditor's claim for prepetition rent was $2,217.85.[19]

---

**16.** 11 U.S.C. section 502(b) contains seven other limitations not relevant in this case. It should be noted that the nine exceptions are set forth in the disjunctive but, according to 11 U.S.C. section 102(5), use of the word "or" is not exclusive.

**17.** Rule 3001(f) provides: "A proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim." Fed. R. Bankr.P. 3001(f). Among other things, the proof of claim must conform substantially to Official Form 10. Fed. R. Bankr.P 3001(a). Paragraph 9 of Official Form 10 directs the claimant to attach copies of supporting docu-

ments or, in the case of voluminous documents, a summary of those documents.

**18.** Page 2 of Exhibit 8 suggests the annual amount of property tax was $638.00 at the commencement of the lease. According to testimony presented at the evidentiary hearing, the annual property tax had increased to $687.00 by the time Debtor ceased making payments to Creditor. Hence, the amount due each month was $57.25. ($687.00 / 12 = $57.25.)

**19.** $2,121.75 basic rent and property tax for three months [($650.00 + $57.25 = $707.25) × 3] + $13.43 January interest as of the

*The Claim for Accelerated Damages*

 Whether a landlord has a claim for actual damages for breach of a rental agreement depends in part upon the lease terms to which the parties agreed. *Aurora Business Park Associates, L.P. v. Michael Albert, Inc.*, 548 N.W.2d 153, 156 (Iowa 1996). It also depends upon the landlord substantiating the claim by a preponderance of the evidence. *D.R. Mobile Home Rentals v. Frost*, 545 N.W.2d 302, 306 (Iowa 1996).

In this case, the Dwelling Unit Rental Agreement is a state bar association form to which Debtor and Creditor added the following paragraph:

22. In the event that Landlord discovers that Tenant has vacated or abandoned the premises during the term of this agreement, or any renewal term, Landlord shall be authorized to immediately take possession of the premises without process of law, and without termination of the lease but in mitigation of damages. In any event, Tenant shall pay Landlord damages to include rent, utilities, insurance and real estate taxes for the unexpired term of this agreement, which shall become immediately due and payable.

(Exhibit 1 at 4.)

 Debtor's rejection of the lease in his Chapter 13 plan and his vacation of the premises triggers the acceleration clause set forth above. Damages may be liquidated under such a clause "but only at an amount that is reasonable in the light of the anticipated or actual loss caused by the breach and the difficulties of proof of loss. A term fixing unreasonably large liquidated damages is unenforceable on grounds of public policy as a penalty." *Aurora*, 548 N.W.2d at 156 (citing *Rohlin Constr. Co. v. City of Hinton*, 476 N.W.2d 78, 80 (Iowa 1991)).

 Actual damages resulting from the breach of a five year lease two and one-half years before the end of the agreed term were uncertain. *Id.* at 157. "The amount fixed in a liquidated damages provision 'is reasonable to the extent that it approximates the loss anticipated at the time of the making of the contract, even though it may not approximate the actual loss.'" *Id.* (quoting Restatement (Second) of Contracts § 356 cmt. b (1981)). Pursuant to Iowa Code sections 562A.4(1) and 562A.29(3),[20] a landlord has a duty to mitigate damages by taking meaningful steps to relet the premises. "Consequently, a landlord is entitled to damages equal to the amount of rent reserved in the lease, plus any other consequential damages, less amounts received in reletting the property." *Aurora*, 548 N.W.2d at 157.

 Arguably, the second sentence of the acceleration clause in issue could be construed as an unenforceable penalty because it does not specifically take into account any offset for amounts received from reletting the premises. However, since the first sentence of the same clause implies some mitigation of damages and because the parties' presentation of evidence covered mitigation of damages, the Court

petition date [$707.25 × .11 × (63 / 365)] + $6.82 February interest as of the petition date [$707.25 × .11 × (32 / 365)] + $ .85 March interest as of the petition date [$707.25 × .11 × (4 / 365)] + $75.00 late fees for three months [$25.00 × 3] = $2,217.85.

20. Iowa Code section 562A.4(1) provides: "The remedies provided by this chapter shall

be administered so that the aggrieved party may recover appropriate damages. The aggrieved party has a duty to mitigate damages." Iowa Code section 562A.29 states in relevant part: "If the tenant abandons the dwelling unit, the landlord shall make reasonable efforts to rent it at a fair rental."

will find that the acceleration clause reasonably approximates Creditor's anticipated or actual loss from Debtor's rejection of the lease and abandonment of the premises.

As of the March 6, 2002 petition date, future rent and future property tax under the remaining term of the lease was $17,681.25.[21] Again, the record is silent with respect to any amounts that would be due for future insurance. Taking into account the $10,393.00 rent Creditor would receive from the new tenant over the same time frame,[22] the liquidated damages amount is $7,288.25.[23] That amount must be reduced to present value. *Aurora*, 548 N.W.2d at 157 (citing *CHR Equip. Fin., Inc. v. C & K Transport, Inc.*, 448 N.W.2d 693, 695 (Iowa App.1989)). Using the rate of interest found in the lease,[24] the present value of Creditor's claim for accelerated damages is $6,487.00.[25]

### The Claim for Maintenance and Repair Costs

■ Though the lease agreement in issue provided that Debtor was responsible for all maintenance except that related to the furnace, it did not specifically state he was to pay Creditor amounts related to maintenance. The record indicates maintenance was a point of confusion and eventual contention between the parties. Accordingly, the Court is not willing to conclude that any maintenance or repair costs fit under the "rent" prong of Iowa Code section 562A.32.

Likewise, aside from the specific acceleration clause discussed above, the lease agreement is silent regarding what maintenance and repair costs Creditor could recover upon regaining possession of the premises and preparing it to be leased to another tenant. Though the *Aurora* decision mentioned a landlord being entitled to "other consequential damages" in addition to the amount of reserved rent,[26] the lease in that case contained the following provision:

> In the event of termination of this Lease by reason of a violation of its terms by the Lessee, Lessor shall be entitled to prove claim for and obtain judgment against Lessee for the balance of the rent agreed to be paid for the term herein provided, *plus all expenses of Lessor in regaining possession of the premises and the reletting thereof,* including attorneys' fees and court costs, crediting against such claim, however, any amount obtained by reason of any such reletting.

*Aurora,* 548 N.W.2d at 154 (quoting lease provision) (emphasis added).

Aside from referencing some other provisions of Iowa Code Chapter 562A (Uniform Residential Landlord and Tenant Law) that discuss a landlord's remedies for

---

**21.** ($650.00 + $57.25 = $707.25) × 25 months (April through December 2002; January through December 2003; and January through April 2004) = $17,681.25.

**22.** $3,483.00 + $5,183.00 + $1,727.00 = $10,393.00. *See* calculations *supra* at notes 2, 3 and 6.

**23.** $17,681.25—$10,393.00 = $7,288.25.

**24.** Neither the record nor the arguments of the parties suggest a different discount rate should apply.

**25.** The per month liquidated damages amount is $291.53. ($7,288.25 / 25 months = $291.53.) Using a discount rate of 11% per annum, or .9167% per month (11% / 12 months = .9167% per month), the present value of that future stream of lost income is $6,487.00. $PV = PMT / (1 + r)^1 + PMT / (1 + r)^2 + \ldots + PMT / (1 + r)^n$ where PMT = payment, r = rate, and n = number of months.

**26.** *See* discussion *supra* p. 15.

a tenant's noncompliance when a rental agreement is in full force and effect, Creditor does not clarify the legal basis for this portion of its claim. Creditor does argue that the reason the notice to quit was limited to Debtor's failure to pay rent is because it did not know about the condition of the premises until it regained possession. That, however, does not explain why the Court should consider the maintenance and repair costs in issue under the "separate claim for actual damages" prong of Iowa Code section 562A.32.

■ Even if the Court could find that Creditor was entitled to prove a claim for maintenance and repair costs, Creditor did not establish such a claim by a preponderance of the evidence. The individual who authored Exhibit 6, a statement concerning the condition of the premises and the work done to repair it, was not present at the evidentiary hearing to clarify which of the alleged repairs and expenses set forth in Exhibits 4 and 5 were related to this portion of Creditor's claim.[27] The testimony of Mr. McHose and the other exhibits are vague and inconclusive, especially given the parties' disagreement about the condition of the premises at the outset of the lease.

B. Allowance of Creditor's Claim.

Creditor's claim for rent, including interest and late fees, does not arise as a result of Debtor's rejection of the unexpired lease. Rather, it was a prepetition claim

as of the date Debtor filed his petition for relief. Pursuant to 11 U.S.C. section 502(b), it is allowable in the full amount of $2,217.85.

■ Creditor's $6,487.00 claim for accelerated damages does arise as a result of Debtor's rejection of the unexpired lease. The majority of courts hold that a rejection or breach of an unexpired lease amounts to a termination of said lease for the purpose of applying 11 U.S.C. section 502(b)(6). *In re Mr. Gatti's Inc.*, 162 B.R. 1004, 1011 (Bankr.W.D.Tex.1994) (citing many of the cases in the majority and in the minority); *In re McLean Enterprises, Inc.*, 105 B.R. 928, 933–34 (Bankr.W.D.Mo. 1989). This Court agrees with the majority.

Since the March 6, 2002 petition date preceded Debtor's vacation of the premises, it controls the first step in the analysis. The rent reserved for one year following the petition date is $8,487.00.[28] The rent reserved for 15% of the remaining 25 months of the lease is $2,652.19.[29] Since the rent reserved for one year is greater than the rent reserved for 15% of the remaining term of the lease, it controls the next step in the analysis. The unpaid rent as of the petition date was $2,217.85.[30] The sum of the rent reserved for one year and the unpaid rent is $10,704.85.[31] Since Creditor's liquidated damages claim of $6,487.00 does not exceed that sum, it con-

---

27. Among other reasons for Exhibits 4 and 5 being excluded from evidence was that they included costs related to the repair and maintenance of the furnace.

28. $707.25 rent × 12 months = $8,487.00. (11 U.S.C. section 101, setting forth definitions for certain terms used in title 11, does not define the term "rent." The Court concludes it is proper to rely on the definition used in determining the amount of the claim under state law.)

29. ($707.25 × 25 months = $17,681.25) × 15% = $2,652.19.

30. *See* calculations *supra* note 19. The late fees in issue are de minimis, and therefore the Court does not address whether the late fees should be excluded from a definition of rent for the purpose of this portion of the analysis.

31. $8,487.00 + $2,217.85 = $10,704.85.

trols the final step in the analysis and will be allowed in toto.

Having determined that Creditor does not have a claim for maintenance or repairs, the Court does not address whether it would have been necessary to include any such damages in the 11 U.S.C. section 502(b)(6) analysis. There are cases holding that the statutory cap covers damages resulting from a tenant's failure to perform maintenance and repairs that were required under the terms of a terminated lease. *See, e.g., In re McSheridan,* 184 B.R. 91 (9th Cir. BAP 1995); *In re Mr. Gatti's Inc.,* 162 B.R. 1004 (Bankr. W.D.Tex.1994). There are cases holding that the limitation does not apply because such damages do not arise from the termination of the lease. *See, e.g., In re Best Products Co., Inc.,* 229 B.R. 673 (Bankr. E.D.Va.1998); *In re Bob's Sea Ray Boats,* 143 B.R. 229 (Bankr.D.N.D.1992); *In re Atlantic Container Corp.,* 133 B.R. 980 (Bankr.N.D.Ill.1991).

## CONCLUSION

WHEREFORE, for the reasons set forth in this Memorandum of Decision, the unsecured nonpriority claim of Lehigh Clay Properties, Ltd., is allowed in the amount of $8,704.85.[32]

A separate Order shall be entered accordingly.

---

**32.** $2,217.85 + $6,487.00 = $8,704.85.