In re LIVING HOPE SOUTHEAST,
LLC, Debtor.

No. 4:12–bk–11082.

United States Bankruptcy Court,
E.D. Arkansas,
Little Rock Division.

Signed Jan. 29, 2014.

James H. Akins, Jr., Smith Akins, Little Rock, AR, Jeannette A. Robertson, Robertson Law Firm, Jonesboro, AR, James E. Smith, Jr., Williams & Anderson, PLC, Little Rock, AR, Morgan E. Welch, Eubanks, Welch, Baker & Schulze, Little Rock, AR, for Debtor.

Robert W. Miller, Michael E. Collins, Justin Damon Wear, Manier & Herod, Nashville, TN, for Michael E. Collins (Trustee).

### ORDER DENYING MOTION FOR RELIEF

AUDREY R. EVANS, Bankruptcy Judge.

On July 25, 2013, the Court heard *Pinewood Enterprises, L.C.'S Motion for Relief From the Automatic Stay* (the "**Motion for Relief**") filed by Pinewood Enterprises, L.C. ("**Pinewood**") (Dkt. # 106); *Trustee Renee S. Williams's Objection to Pinewood Enterprises L.C.'s Motion for Relief From Stay* filed by Renee Williams (the "**Southwest Trustee**") (Dkt. # 190); *the First Amended Objection To Pinewood Enterprises, L.C.'s Motion For Relief From The Automatic Stay* filed by the Southwest Trustee (Dkt. # 314); and the *Objection to Motion for Relief from Stay* filed by Michael E. Collins (the "**Southeast Trustee**") (Dkt. # 323). Dr. James Naples has been substituted for Pinewood with respect to the Motion for Relief. *See Order Denying in Part Motion to Substitute* (Dkt. # 316).[1] At the close of evidence, the Court explained it would allow closing briefs and entered an order setting forth deadlines for those briefs, and they have since been timely filed. For the reasons explained herein, the Court denies Naples's Motion for Relief.

### INTRODUCTION

The factual background and history of this Chapter 11 Debtor, as well as certain related entities and individuals, has been described extensively in the *Addendum to: Order Granting Motions to Appoint Trustee* (Dkt. # 293) entered on July 9, 2013

---

1. The Court granted Naples's request to substitute for Pinewood with respect to pleadings filed before December 31, 2012, the effective date of Naples's sale of his membership interest in Pinewood in which he assigned to himself all causes of action, including the pending case against Debtor and others in Miller County Circuit Court. The Court denied Naples's request to substitute for Pinewood with respect to pleadings filed by Pinewood after December 31, 2012. Naples appealed the Court's order to the U.S. District Court for the Eastern District of Arkansas where it has been consolidated with the appeal of the Court's decision on Naples's motion for an order that the automatic stay had previously terminated (*see* n. 10, *infra*). *Naples v. Williams*, No. 4:13–cv–499–DPM. Other decisions by the Court, including the *Order Granting Motions to Appoint Trustee* (Dkt. # 220), the addendum to that order (Dkt. # 293), and various orders denying motions to alter or amend have also been appealed to the U.S. District Court for the Eastern District of Arkansas and consolidated with 4:13–cv–499–DPM. Those appeals are: *Naples v. Williams*, No. 4:13–cv–00667–DPM; *Stephens v. Williams*, No. 4:13–cv–00723–DPM; and *A.K. Tennessee Irrevocable Trust v. Williams*, 4:13–cv–00670–DPM.

(the **"Addendum"**). The Court will not repeat that background here. The Debtor is an Arkansas Limited Liability Company that provides outpatient psychiatric services and has been profitable most months since filing bankruptcy according to its operating reports. From the case's inception, according to multiple statements made before this Court, the purpose of this Debtor's Chapter 11 filing has been to allow it to operate while defending litigation in several courts, and to bring that litigation to a close and liquidate claims against it so that it could determine whether it could propose a feasible Chapter 11 plan. On April 19, 2013, the Court granted motions to appoint a Chapter 11 Trustee, and on May 2, 2013, the Court ordered the appointment of Michael E. Collins as the Trustee of the Debtor. The Southeast Trustee is now seeking a buyer for the Debtor.

The Motion for Relief currently before the Court seeks relief from the automatic stay to allow Naples to pursue litigation against the Debtor and 12 other defendants that has been pending in the Miller County Circuit Court since 2006 (the **"Miller County Case"**).[2] Naples has not yet filed a claim in this bankruptcy case but has actively participated in this case and asserts that it is a creditor of the Debtor based on the pending Miller County Case. The claims deadline has been tolled with respect to Naples until a decision is reached on the Motion for Relief. *See Order Extending Bar Date as to Certain Parties and Denying, in Part, Motion to Set Aside or Stay the Ex Parte Order Fixing the Time for Filing Proofs of Claim, or to Extend Bar Date and for an Emergency Hearing,* entered on June 25, 2013 (Dkt. # 274). If relief from stay is not granted to allow Naples to proceed with the Miller County Case, Naples admittedly will file a claim in this case (Transcript at 121, 124) and the Court will then determine whether the Debtor is liable to Naples in the context of claims litigation.

There are two other active creditors in this case: the Southwest Trustee, who holds a liquidated claim in the amount of $1.19 million (the **"Southwest Judgment"**), and two entities represented by Greg Stephens:[3] the Estate of Wanda Stephens[4] and Living Hope Institute (**"LHI"**). (These two entities are collectively referred to as the **"Greg Stephens Entities"**.) The Southwest Judgment was awarded by Judge James G. Mixon in *Williams v. Living Hope Southeast,* an adversary proceeding in which the Southwest Trustee sought to capture the monetary value of Southwest's post-petition transfer of its business to the Debtor. *Williams v. Living Hope Southeast (In re Living Hope Southwest),* No. 4:09–ap–7023 (the **"Southwest AP"**). Appeals related to the Southwest Judgment are pending in the United States District Court for the Western District of Arkansas.

Greg filed claims in this case on behalf of the Estate of Wanda Stephens and LHI.

---

2. The Miller County Case is styled: *Pinewood Enterprises, L.C. v. David Kimbro Stephens, Daphna Alice Stephens, Living Hope Institute, Inc., The Kimbro Stephens Insurance Trust; The Alice Stephens Insurance Trust; Living Hope Southeast, LLC; Living Hope Healing Waters; Stephens & Company, Inc.; Ouachita Limited Partnership; Veritas Limited Partnership; the AK Tennessee Irrevocable Trust; Mike Grundy and Robert Williams* (Case No. CIV–2006–258–3).

3. Because many individuals named Stephens are involved in this case, those individuals will be referred to by their first names in this Order.

4. Wanda Stephens was Greg and Kimbro's mother.

Greg also filed cross-claims on behalf of his mother's estate and LHI [5] in the pending Miller County Case against the Debtor and other cross-defendants (*i.e.*, Kimbro, Alice, Mike Grundy, and various related entities of the Stephenses). Although Greg attempted to have a consent judgment entered in favor of these entities in the Miller County Case approximately one year ago, he has not sought relief from the automatic stay in the Debtor's case to pursue those cross-claims in Miller County.[6] The Miller County Case is described below in more detail.

## THE MILLER COUNTY CASE

The most recently amended complaint (the **"Second Amended Complaint"** or **"Complaint"**) filed in Miller County names 13 defendants, including the Debtor. The litigation was originally brought by Pinewood after Living Hope Southwest breached a lease and allegedly damaged the real property (a building) it leased from Pinewood. The Complaint alleges that the Debtor (and others) should be held liable for the debts of Living Hope Southwest and/or LHI through a triangular veil-piercing theory. The Complaint seeks to pierce the corporate veil of Living Hope Southwest to impose liability on its members, Kimbro and Alice, and to reverse-pierce the veil of other related entities, such as the Debtor, to impose liability on those entities for the debts of Alice and Kimbro. The Complaint also asserts that the defendants engaged in a civil conspiracy to defraud Pinewood. Alleging that each is the alter ego of the other, the Complaint attempts to hold Alice, Kimbro, Mike Grundy (the Debtor's CEO), Robert Williams who is now deceased (former trustee of the A.K. Trust, the principal owner of the Debtor) and related entities liable for the debts of LHI based on allegations that these defendants caused LHI to transfer its business to the Debtor and used LHI's Medicare provider numbers. The debt owed to Pinewood by LHI is based on a $1.3 million consent judgment entered against LHI (arising from its guaranty of Living Hope Southwest's lease obligation to Pinewood). The Complaint further endeavors to pierce the Debtor's corporate veil to reach the assets of its 99% member, the A.K. Trust. The Complaint seeks punitive damages and a constructive trust on any assets conveyed by a defendant to another defendant except those transfers made by the Debtor (because, according to Naples's brief, any

---

5.  Ameriwest Health Services, Inc. (**"Ameriwest"**) was also a cross-claimant in the Miller County Case, but it has not filed a claim in Debtor's bankruptcy case. Ameriwest is the shareholder of LHI (and therefore successor-in-interest to LHI), and Greg serves as President of Ameriwest. Ameriwest is owned by the Ken Stephens Insurance Trust (**"KSIT"**). Ken, Greg and Kimbro's father, serves as Trustee for the KSIT, and the beneficiary is a grandchildren's trust for the benefit of Wanda's eight grandchildren (who include Kimbro's two daughters, Greg's five children, and Philip's child).

6.  The proposed consent judgment settled the cross-claims and agreed to the entry of a consent judgment granting LHI's attorneys a $50,000 judgment, and granting cross-claimants Ameriwest and the Estate of Wanda Stephens a $1.2 million judgment plus pre-judgment interest from January 1, 2011, at 10%, and post-judgment interest at the same rate, and court costs. This proposed consent judgment also granted Ameriwest and the Estate of Wanda Stephens a constructive trust and equitable lien on the assets of the Debtor and the A.K. Tennessee Irrevocable Trust (the **"A.K. Trust"**) (99% owner of the Debtor). As described in the Addendum (at 5–6), this Court found that the consent judgment was an attempt to place all of the Debtor's assets in a constructive trust for the benefit of family owned entities before Judge Mixon could possibly impose a constructive trust on the Debtor's assets in favor of the Southwest Trustee for the benefit of all of Southwest's creditors, including Pinewood.

causes of action stemming from transfers by the Debtor are vested in the Southeast Trustee).[7] Finally, the Complaint requests an accounting and sanctions for alleged violations of an injunction previously entered in the Miller County Case; these alleged violations include payments made by the Debtor. In Sum, the Complaint seeks to hold all of these entities and individuals liable for any debt owed to Pinewood by any of these entities or individuals.

7. The Complaint, filed prior to the Debtor's Chapter 11 bankruptcy, states at ¶ 61:

> Based on the allegations of liability set forth above, and to the extent that assets of the obligors under the Lease, the Guaranty Agreement and as set forth above were constructively or fraudulently transferred from LHI or any other Defendant who is not a debtor in a pending bankruptcy case, *or are traced into other assets of any other Defendant who is not a debtor in a pending bankruptcy case,* Pinewood seeks to recover the transfers or impose a constructive trust and equitable lien on those assets as well as an injunction to prevent Defendants from further transferring the assets to prevent additional fraud on Pinewood.

Emphasis added. This language would indicate Naples's complaint would not seek to impose a constructive trust on assets transferred to the Debtor; however, his brief and arguments at trial acknowledged that he does in fact seek a constructive trust on assets transferred to the Debtor from LHI. *See e.g.,* Transcript at 9:20; 45:12–14; 100:9–14.

8. Living Hope Southwest is no longer a Defendant in the Miller County Case.

9. By order entered May 2, 2011 (Dkt. # 63), Pinewood was granted relief from stay in Kimbro's personal bankruptcy case (6:10–bk–76216) to pursue and liquidate its claims in the Miller County Case, but not to collect or attempt to collect any judgment, except through Kimbro's bankruptcy proceeding. Greg also moved for relief from the automatic stay in Kimbro's case on behalf of cross-claimants in the Miller County Case: LHI, Ameriwest Health Services, Inc. (**"Ameriwest"**), and the Estate of Wanda Stephens.

Due to the bankruptcies of defendants Living Hope Southwest,[8] Kimbro,[9] and the Debtor, Living Hope Southeast, as well as multiple court proceedings arising from those bankruptcies, the Miller County Case has been delayed for seven years; the current and most recent obstacle to prevent the case from proceeding to trial is the automatic stay in this Debtor's case.[10] The Miller County Case was removed to federal district court twice—first, upon the filing of Kimbro's Chapter 7

That relief was granted on September 26, 2011 (Dkt. # 97). The Orders granting relief from stay included the following limitation:

> ... the automatic stay is not terminated, lifted, or annulled with respect to any property of the estate held or owned by the debtor, or held by or within the possession of any third party, including any current or future defendants in the State Litigation. This proscription includes, but is not limited to, equity interests or transfers of value to the debtor in the ordinary course of the debtor's or any third-party's ordinary course of business....

10. Although Pinewood's Motion for Relief was originally filed December 19, 2012, and scheduled for hearing for January 24, 2013, it was not heard until July 25, 2013, due to a number of intervening pleadings and hearings. Specifically, the initial setting for the Motion for Relief was moved up to January 14, 2013, because Pinewood filed an Amended Motion for Relief From Stay on January 7, 2013, which stated that it incorporated the original motion and sought an emergency hearing. To afford Pinewood the emergency hearing it sought, both the amended motion and the original motion were re-set for January 14, 2013. The Court then heard and decided Pinewood's amended motion which sought relief to move to intervene in the Southwest AP, and continued the original motion because it did not need to be decided on an emergency basis. The original motion was then set for February 14, 2013, because the Court's docket for January 24, 2013 (the original setting for the Motion for Relief) was too full. Before the Motion for Relief could be heard, motions to appoint a Chapter 11 trustee were filed along with motions to substitute counsel and other pleadings. The Motion for

bankruptcy, and second, following the filing of this Debtor's bankruptcy. In the first instance, the Honorable Richard Taylor remanded the case back to Miller County on Pinewood's motion. *See Order Granting Motion for Abstention and Remand, Stephens v. Pinewood Enterprises, LLC (In re David Kimbro Stephens)*, No. 6:11–ap–7004 (Mar. 21, 2011) (Dkt. # 28). In the second instance, the Honorable Susan Hickey granted Pinewood's motion to remand the case to Miller County Circuit Court.[11] *See Pinewood Enterprises, L.L.C. v. Stephens, et al.,* 2012 WL 6049148 (W.D.Ark. December 5, 2012). According to Naples, the Miller County Case had been stayed or enjoined due to the bankruptcies of defendants for a total of 1,950 days as of the July 25, 2013 hearing on its motion for relief, out of the total 2,577 days it had been pending. (Naples Exhibit # 39.) The Southwest Trustee countered that Pinewood (Naples's predecessor) did not move for relief from stay in the Living Hope Southwest case until it had been pending a total of 1,235 days (approximately 3.4 years). Naples explained that Pinewood did not seek relief from stay sooner because it was receiving adequate protection payments on its lease while Living Hope Southwest was in a Chapter 11 (approximately two years), and that it also wanted to give the company a chance to reorganize before seeking relief.

Relief was then continued several times due to a lengthy trial on two motions to appoint a Chapter 11 Trustee. A Chapter 11 trustee was appointed on April 19, 2013. On June 7, 2013, Naples (in substitution for Pinewood) filed a *Motion for Order that the Automatic Stay has Terminated* (Dkt. # 246) asserting that the automatic stay had terminated under § 362(e) because a hearing was not held within 30 days of its filing. The Court denied that motion on June 26, 2013; Naples appealed the Court's decision to the U.S. District Court for the Eastern District of Arkansas where it

## LEGAL STANDARD

■ Relief from the automatic stay shall be granted "for cause" under 11 U.S.C. § 362(d)(1). The stay may be lifted "for cause" to allow litigation involving the debtor to proceed in another forum under certain circumstances. *In re Blan (Blan v. Nachogdoches County Hospital)*, 237 B.R. 737 (8th Cir. BAP 1999) (*citing* H.R.Rep. No. 95–595, at 341 (1977), 1978 U.S.C.C.A.N. 5963, 6297–98; S.Rep. No. 95–989, at 50 (1978), 1978 U.S.C.C.A.N. 5787, 5835–37). Although a creditor moving for relief from stay must make a prima facie case that cause exists, the Debtor has the ultimate burden of proof in opposing motions for relief from stay except where equity in property is at issue. 11 U.S.C. § 362(g). *See In re Anton,* 145 B.R. 767, 769 (Bankr.E.D.N.Y.1992). The Bankruptcy Court has wide discretion in determining whether or not to lift the automatic stay. *Id.*

■ "In making the determination of whether to grant relief from the stay, the court must balance the potential prejudice to the Debtor, the bankruptcy estate and to the other creditors against the hardship to the moving party if it is not allowed to proceed in state court." *In re Blan,* 237 B.R. at 739 (*citing Internal Revenue Service v. Robinson (In re Robinson)*, 169 B.R. 356, 359 (E.D.Va.1994); *Matter of United Imports,* 203 B.R. 162, 166 (Bankr. D.Neb.1996); *In re Marvin Johnson's*

has been consolidated with the appeal of the Court's decision on Naples's Motion to Substitute for Pinewood and orders related to the appointment of a trustee in this case (*see* n. 1, *supra* ). *Naples v. Williams*, No. 4:13–cv–499–DPM.

11. Normally, when a state court case is removed to federal district court because it is related to a pending bankruptcy case, the case is automatically referred to the bankruptcy court pursuant to Local Rule 83.1. That did not happen in this case.

*Auto Service, Inc.,* 192 B.R. 1008, 1014 (Bankr.N.D.Ala.1996); *Smith v. Tricare Rehabilitation Systems, Inc. (In re Tricare Rehabilitation Systems, Inc.),* 181 B.R. 569, 572–73 (Bankr.N.D.Ala.1994)). Bankruptcy courts routinely use the following factors to balance the hardships between the moving and opposing parties: (1) judicial economy; (2) trial readiness; (3) the resolution of preliminary bankruptcy issues; (4) the creditor's chance of success on the merits; and (5) the cost of defense or other potential burden to the bankruptcy estate and the impact of the litigation on other creditors. *Id.* (*citing United Imports,* 203 B.R. at 167; *In re Johnson,* 115 B.R. 634, 636 (Bankr.D.Minn. 1989); *In re Curtis,* 40 B.R. 795, 799–800 (Bankr.D.Utah 1984)). Not all factors must be present, and equal weight need not be given to each factor. *In re Anton,* 145 B.R. at 770. Furthermore, it is not necessary that all factors be found in favor of the movant before the stay may be lifted. *Smith v. Tricare,* 181 B.R. at 577.

## DISCUSSION

■ Naples argues that all the *Blan* factors warrant relief from the automatic stay to proceed in state court. The Southwest Trustee disputes that the *Blan* factors warrant relief and argues that even if some factors weigh in favor of relief, the risk of Naples obtaining a constructive trust on the Debtor's assets is too great a burden on the estate and the other creditors. The Southeast Trustee asserts that the Court should consider all the circumstances of this case in addition to the *Blan* factors, particularly that he is in the process of finding a buyer for the Debtor. Having studied the record in this case, and taking into account the long litigious history of these parties, the Court denies relief from stay to allow the Miller County Case to proceed against the Debtor based on its analysis of the circumstances of this case

and its current posture in addition to the *Blan* factors, as described below.

### Judicial Economy

Naples asserts that in evaluating judicial economy, the Court must give great weight to its lack of jurisdiction over the 12 co-defendants and the duplication that would result from trying the co-defendants separately. Because the case has been remanded from district court already, and because relief from stay has been granted by Judge Taylor in Kimbro's case (and Judge Taylor also remanded the case back to Miller County on a prior removal), the case is ready to proceed against all defendants except the Debtor who is still protected by the automatic stay. If relief from stay is not granted, Naples will be required to try the same state law claims with the same witnesses and facts in this Court as well. Naples points out that there is a possibility of inconsistent results if that portion of the Complaint against the Debtor is tried in this Court while the case against the remaining co-defendants is tried in Miller County. Naples also raises the possibility that the Southeast Trustee will need to be present in Miller County whether Naples proceeds against the Debtor or just the other co-defendants due to the intertwining of the Debtor and other entities and individuals and the degree to which the cases are "inextricably intertwined."

Naples further asserts that judicial economy will be served if the case is tried in Miller County because there is no outstanding discovery in the Miller County Case; the State Court judge, the Honorable Kirk Johnson, is familiar with the case; the location of witnesses and documents is neutral; Judge Susan Hickey already found the case was ready for trial; and there are no preliminary bankruptcy

issues for the state court judge to decide if the case is tried in Miller County.

The Southwest Trustee, who has a liquidated claim for $1.19 million, argues that while principles of judicial economy prefer that a case be tried in a forum with jurisdiction over all the parties, this factor is not dispositive in this case (citing *United Imports, Inc.*, 203 B.R. 162). The Southeast Trustee also asserts judicial economy is not served by allowing the Miller County Case to proceed in Miller County because even if the case is tried there, this Court will still need to adjudicate Naples's claim, as other creditors who are not parties to the Miller County Case (such as the Southwest Trustee) would likely object to any claim filed by Naples in this case.[12] The Southeast Trustee also argues that Naples's claim could be subject to equitable subordination by this Court. The Southeast Trustee cites *In re Patel*, 291 B.R. 169 (Bankr.D.Ariz.2003), in which the court denied relief from stay to continue with two state court actions, stating:

> ... retaining the automatic stay in effect may promote judicial economy by preventing the duplication of litigation. Even if the stay were lifted so that Shepard could liquidate his claims in state court, it still may be necessary to have essentially duplicative litigation in this Court. Other creditors may object to Shepard's proof of claim and assert they are not barred by res judicata or collateral estoppel because they were not parties to the state court litigation. The liquidated claim may be subject to some unique bankruptcy defenses such as subordination pursuant to § 510(b) or (c) or disallowance pursuant to § 502(b)(2), (4) or (5). The claim may

need to be estimated pursuant to § 502(c).

291 B.R. at 174. Naples distinguishes the *Patel* case on its facts and argues that litigation over the proof of claim is not the same as litigation to establish liability; that proof of claim litigation is additional litigation but not duplicative litigation. The *Patel* case involved two separate lawsuits, both of which were pending against the debtor, and one of which was pending against a related entity whose bankruptcy case was being jointly administered with the debtor's. However, despite these factual differences, many of the pronouncements made by the *Patel* court apply equally here. Specifically, that court's emphasis on fairness to all parties, allowing the debtor a breathing spell from litigation, and providing a better mechanism for determining which issues are ultimately of consequence in a Chapter 11 case are particularly applicable to this case. For instance, the *Patel* Court states:

> Third, the bankruptcy court is in a better position than is a nonbankruptcy court to ascertain what is important to be decided and when, and what may be moot or may be resolved by alternative processes such as confirmation of a plan. In that context, nonbankruptcy court litigation may be extremely wasteful. For example, under most civil procedure processes a plaintiff must ordinarily present all related claims, causes of actions and legal theories or risk their waiver or preclusion. Thus from a bankruptcy perspective a plaintiff such as Shepard may be required to assert and litigate together claims that a bankruptcy court would classify as general

---

**12.** The Southeast Trustee further argues that Naples's claim could be limited by § 502(b)(6) which limits lease termination damages, but as pointed out by Naples, this provision applies to lease termination damages once a

Debtor rejects an unexpired lease post-petition, not to pre-petition damages arising from a terminated lease. 11 U.S.C. § 502(b)(6). *See generally In re VanZandt*, 326 B.R. 737, 749 (Bankr.S.D.Iowa 2004).

unsecured claims, as claims that are subordinate to some or all other claims pursuant to 11 U.S.C. § 510(a), (b) or (c), or that are actually equity interests rather than claims at all. Depending on the structure of a Chapter 11 plan, however, some or all of these issues may be moot. Thus the bankruptcy court is in a better posture to determine the claims issues that will have a real significance, while deferring the determination of issues that may become moot. It would be a clear waste of resources to require all such issues to be resolved by a non-bankruptcy court without regard to their treatment in a Chapter 11 plan.

*Id.* at 173–74.

While the Court agrees that principles of judicial economy are generally best served by allowing the court with jurisdiction over all defendants to try that particular case, the posture of this Debtor's bankruptcy case challenges that general rule. In this case, as in *Patel*, nonbankruptcy court litigation will likely be extremely wasteful. If the case is tried in Miller County against the Debtor, the Trustee will incur administrative expenses defending that suit, when the claim may be worthless in any case (depending on the value of the Debtor and the amount of administrative expenses and any other priority claims). Further, even if Naples establishes liability against the Debtor in Miller County, there will likely be continued claims litigation in this Court. The Court also notes that Greg has filed two claims in this case, which are factually related to the Miller County Case, but he has not moved for relief to proceed in Miller County, and this Court will have to adjudicate those claims provided there are funds with which to pay them and no settlement is reached. Allowing the Trustee to proceed with his efforts to sell the Debtor without the distraction of trying of a lawsuit in Miller County is reasonably certain to reduce the total amount of litigation in this case, which is beneficial to both the parties, the Debtor's creditors, and the courts. Under these circumstances, the Court does not find that judicial economy weighs in favor of granting Naples relief from stay.

### *Trial Readiness*

In asserting that the Miller County Case is ready to proceed in Miller County, Naples points out that Judge Hickey has already concluded that the Miller County Court "appears poised" to try the case, and that Judge Taylor likewise held in connection with Kimbro's Chapter 7 bankruptcy case that the Miller County Case was a "well-progressed lawsuit" and could be timely resolved there. Naples points to what has transpired in that case already: (1) Judge Johnson held a hearing and issued a preliminary restraining order; (2) a consent judgment was entered against LHI; and (3) Judge Johnson held a hearing on various discovery matters in February 2012 and also denied motions to dismiss filed by all of the defendants except Debtor whose motion to dismiss was stayed as a result of the bankruptcy filing.

Arguing that the Miller County Case is not trial-ready, the Southwest Trustee points out that the Debtor has yet to file an Answer in the Miller County Case; the Debtor has a pending motion to dismiss; as the recently appointed trustee, he has not had the opportunity to conduct his own discovery or otherwise defend the lawsuit; and that other defendants may need to conduct additional discovery as well. Specifically, the Southeast Trustee argues that more discovery is needed as to which assets of the Debtor Naples seeks to impose a constructive trust, as well as the circumstances under which Pinewood received a $1.3 million consent judgment against LHI whose guarantee of the lease at issue was

strictly limited to $500,000. Naples labels the Trustee's statement that additional discovery may be needed by other defendants as mere speculation, and that to the extent the case is not ready to be tried in Miller County, it is not ready to be tried in bankruptcy court either.

Additionally, the Southeast Trustee asserts that Judge Hickey's finding that Miller County was "poised to adjudicate the case" in her ruling to remand the Miller County Case to Miller County based on mandatory abstention is not the same as a finding the case is trial-ready for purposes of relief from stay, and that accordingly, issue preclusion does not apply. The Southeast Trustee points out that whether a case can be timely adjudicated in another forum is an element of mandatory abstention that must be answered yes or no, while the degree of trial-readiness is simply a factor for the Bankruptcy Court to consider while ruling on a motion for relief from stay to allow litigation to continue in another forum. The Court agrees that issue preclusion does not preclude this Court from reaching a different conclusion as to the degree the Miller County Case is ready for trial, particularly where a trustee has since been appointed for the Debtor.

With respect to trial readiness, the Court finds that the Miller County Case is far enough along to find that this factor weighs in favor of granting relief from stay, although not strongly, as the Debtor must still file an answer, some additional discovery is needed, and the Southeast Trustee would now be involved. However, other factors, discussed below, simply outweigh the trial readiness factor at this time.

### Resolution of Preliminary Bankruptcy Issues

Although Naples asserts there was no evidence of any preliminary bankruptcy issues to be decided in the stayed action and that the Complaint involves only state law issues, the Southeast Trustee and the Southwest Trustee argue there are preliminary bankruptcy issues because Naples has not filed a proof of claim and may not be entitled to share in the distribution of any estate assets in any case. In support, both the Southeast Trustee and the Southwest Trustee cite *United Imports, supra,* and *Benedor Corp. v. Conejo Enters., Inc. (In re Conejo Enters., Inc.),* 96 F.3d 346, 352–53 (9th Cir.1996). In *United Imports,* the court held that a bankruptcy estate should not "be forced to defend a lawsuit in which any monetary judgment obtained in the suit could not be enforced against assets of the estate." 203 B.R. at 168. Likewise, the Ninth Circuit Court of Appeals in *Conejo* held that

> The inevitability of the decision to file or not file a proof of claim was appropriately considered by the bankruptcy court in denying relief from the stay. As the bankruptcy court noted, if Benedor filed a proof of claim, the bankruptcy court would have core jurisdiction over the claim under 28 U.S.C. § 157(b)(2)(B), allowance or disallowance of claims. If Benedor did not file a proof of claim, the state action claim would be discharged in bankruptcy. It would be absurd to allow the state action to go ahead and require the estate to spend money litigating a debt that might ultimately be uncollectable. Thus, the bankruptcy court's "wait and see" approach was both reasonable and appropriate.

*Conejo* at 352–53. *Conejo* also involved a situation where the District Court had determined that mandatory abstention required the case be remanded to state court, but the appellate court determined that the question of stay relief is a separate analysis that should take into account whether or not the creditor has filed a

proof of claim—in essence, that whether or not the creditor is a claimant in the bankruptcy is a preliminary issue to be resolved by the Bankruptcy Court. The Southeast Trustee points out that if a proof of claim is filed, determination of the claim is a core proceeding over which this Court has arising in, core jurisdiction. If a proof of claim has not been filed, relief from stay is irrelevant—there is no point in having the estate litigate against a creditor who cannot collect.

This Court agrees with the Southeast Trustee's position. Determining whether Naples has an allowable claim in this bankruptcy proceeding is a preliminary bankruptcy issue. At trial, the Southeast Trustee argued that Naples's Motion for Relief constitutes an informal proof of claim;[13] however, it is unnecessary to make any finding regarding an informal proof of claim because Naples testified that if relief is not granted, he will file a proof of claim. Transcript at 121. As stated in the Court's June 25, 2013 order that extended the bar date for Naples, Naples has until 30 days after the entry of this Order to file a claim. Finally, the Court notes that although the resolution of whether LHSE owes Naples is a preliminary bankruptcy matter which may be decided in the context of claims litigation, filing a proof of claim does not necessarily mean that relief from stay should or should not be granted. There are instances where the balancing of the *Blan* factors will indicate that a claim should be liquidated outside bankruptcy court, and the Court does not mean to imply that whether or not a party has filed a claim will preclude stay relief in every case.

Additionally, the Southwest Trustee argues that the avoidance powers of § 544(a)(3) might trump any attempt to impose a constructive trust sought by Naples in Miller County. *See e.g., In re Paul J. Paradise & Associates, Inc.,* 249 B.R. 360, 366–67 (D.Del.2000); *In re Perrow,* 498 B.R. 560, 575–76 (Bankr.W.D.Va.2013); *In re Project Homestead, Inc.,* 374 B.R. 193 (Bankr.M.D.N.C.2007). This argument is well-taken because it illustrates the complexity that will result should relief from stay be granted. However, it is not necessary to discuss at length, as relief from stay is not granted to allow a constructive trust to be imposed on the Debtor's assets in any case, as discussed below.

### Success on the Merits

Naples contends he is likely to succeed on the merits of the Miller County Case, based on rulings by Judge Johnson in Miller County and Judge P.K. Holmes III. Specifically, while describing the background of the Southwest AP in a decision reversing the approval of a settlement of that case, Judge Holmes stated that the Stephenses (Alice and Kimbro) had fleeced both Living Hope Southwest and LHI, used those assets to fund the Debtor (LHSE), and then used LHSE as their primary source of money. Judge Johnson found in a Preliminary Injunction/Restraining Order that Naples's predecessor, Pinewood, was likely to prevail on the merits and be able to pierce the veils of the

---

**13.** *In re Haugen Const. Servs., Inc.,* 876 F.2d 681 (8th Cir.1989) provides the standard for evaluating whether an informal proof of claim has been made:

> ... the statute requiring that a proof of claim in writing be filed is clear, positive and unambiguous and it must not be nullified in the name of equity. If the record made within the statutory period, formal or informal, disclosed facts showing an assertion of a claim against the estate and an intention by the claimant to share in its assets, there would be a basis for the proposed amendment * * *.

*Id.* at 682 (quoting *In re Donovan Wire & Iron Co.,* 822 F.2d 38, 39 (8th Cir.1987) (per curiam) and *Tarbell v. Crex Carpet Co.,* 90 F.2d 683, 685–86 (8th Cir.1937) (emphasis added)).

defendants. Naples argues that collateral estoppel applies to prevent the relitigation of his likelihood of success provided the Preliminary Injunction is a final order, and that even if collateral estoppel does not apply, Judge Johnson's rulings are strong evidence of his likelihood of success.

The Court finds that collateral estoppel does not apply to Judge Johnson's preliminary injunction. While the order finds that corporate veils are likely to be pierced, and that Kimbro and Alice have likely made fraudulent transfers, it makes no findings with respect to transfers from LHI to the Debtor and the likelihood of success with respect to a constructive trust on LHSE's assets. Further, preliminary injunctions are not considered final orders for purposes of collateral estoppel. *See generally Medtronic, Inc. v. Gibbons,* 684 F.2d 565, 569 (8th Cir.1982) ("Moreover, the doctrine of collateral estoppel requires a prior final judgment; the granting or denial of a preliminary injunction is generally not based on a final decision on the merits and is not a final judgment for the purposes of collateral estoppel.") (citing *Starbuck v. City & County of San Francisco,* 556 F.2d 450, 457 n. 13 (9th Cir. 1977), citing 1B Moore's Federal Practice PP 0.401, .409(1), .441(2) (2d ed. 1947)). Accordingly, the Court must examine more closely whether Naples is likely to succeed in Miller County.

The Southwest Trustee questions Naples's likelihood of success in Miller County by pointing out that Naples's theory of liability against the Debtor is predicated on applying a reverse veil piercing theory to establish liability on the Debtor for LHI's guarantee of Living Hope Southwest's lease agreement which was capped at $500,000. The Southwest Trustee also cites Grundy's testimony in the Southwest AP trial (the transcript of which was put into evidence during the hearings on the motions to appoint the trustee) in which he stated that the Debtor never received any assets from LHI and used LHI's provider number pursuant to a contractual agreement. The Southwest Trustee also contends that Naples's success of obtaining a constructive trust on the Debtor's assets is slim as it is a remedy rarely granted and only in the most egregious circumstances. *See United Imports* at 169 (citing *Chiu v. Wong,* 16 F.3d 306 (8th Cir.1994)).

Likewise, the Southeast Trustee argues that Naples's likelihood of success in obtaining a constructive trust is questionable given that Judge Mixon's ruling that no actual assets passed from Living Hope Southwest to the Debtor, and Grundy's testimony regarding LHI and the Debtor (as described above). With respect to Naples's reverse veil-piercing theory, the Southeast Trustee argues that there is no basis under which a court can find that LHI and the Debtor are the alter egos of each other because there is no parent-subsidiary relationship between the Debtor and LHI and the two entities do not share common shareholders (*i.e.,* the shareholder of LHI was Wanda Stephens, and the members of the Debtor are Kimbro Stephens and the A.K. Trust). Naples responds that he is seeking to pierce the veil of all entities to Kimbro (*i.e.,* although Kimbro is not the shareholder of LHI, Naples maintains he was in fact controlling LHI) to assert liability against the Debtor LHSE.[14] The Southeast Trustee concludes

---

14. While the Southeast Trustee asserts there is no Arkansas law providing for the piercing of the corporate veil in the absence of a parent-subsidiary relationship, Naples cites *Bancorp S. v. Richmond (In re Richmond),* 430 B.R. 846 (Bankr.E.D.Ark.2010), for the proposition that an alter ego and piercing claim is not dependent on a parent-subsidiary relationship but on an individual's actual control over an entity. *Richmond* states:

that while Naples might be successful on some of his claims, he may be wholly unsuccessful given the difficulty of proving that Kimbro controlled LHI and is therefore liable for LHI's debts, and in proving that assets were in fact transferred from LHI to LHSE. Therefore, the Southeast Trustee argues that Naples is not likely to succeed on the merits with respect to imposing liability on the Debtor.[15]

Despite the difficulty in establishing alter ego liability and particularly reverse piercing, given the actions of some of the individuals involved, the Court finds it is likely Naples can pierce the veils of *some*

defendants—after all, this Court has already found that Kimbro controls LHSE for his own benefit—but the Court does not find a strong likelihood that Naples will successfully establish liability against the Debtor LHSE for the debts of LHI given the complexities of Naples's legal theories, and Grundy's previous testimony in this case regarding the relationship between LHI and LHSE.

### Cost and Burdens to Respective Parties

The parties make several distinct arguments regarding the burdens they face if the Miller County Case is allowed to pro-

---

When a corporate form is challenged, "the real basis of liability is actual control and manipulation of the other, whether that control and manipulation be exercised by virtue of stock ownership or otherwise." *Constellation Development Corp. v. Dowden (In re B.J. McAdams, Inc.)*, 66 F.3d 931, 937 (8th Cir.1995) (quoting *Henderson v. Rounds & Porter Lumber Co.*, 99 F.Supp. 376 (W.D.Ark.1951)). Although it may be difficult to find an Arkansas alter ego/piercing-the-veil case that pierces an entity in favor of a third-party control person with no actual ownership interest, that did occur in *Constellation* (in the context of invalidating a lien purportedly held by that third party), and accordingly, a direct parent-subsidiary relationship may not be essential to a piercing-the-veil claim in Arkansas. However, as noted by the Arkansas Court of Appeals, "the rule of piercing the fiction of a corporate entity should be applied with great caution." *Humphries v. Bray*, 271 Ark. 962, 611 S.W.2d 791 (Ark.Ct.App.1981). So while it may not be impossible to assert a veil-piercing claim against a non-owner, even veil-piercing in the traditional context is not favored, and is difficult to prove.

15. Just as piercing in a non parent-subsidiary context is difficult, "triangular piercing"—the piercing of one entity to its shareholders, and then from the shareholders to other entities they own—is a unique remedy that is not easily established. The Honorable G. Thomas Eisele described triangular piercing in *Nursing Home Consultants, Inc. v. Quantum Health Services, Inc.*, 926 F.Supp. 835

(E.D.Ark.1996) aff'd, 112 F.3d 513 (8th Cir. 1997):

a triangular pierce results from a sequential application of the traditional piercing doctrine and the "reverse piercing" doctrine—which is itself controversial in that it allows corporations to be held liable for the acts of their shareholders [citations omitted]—which thereby permits two related, though independent, corporate entities (often referred to as "sister corporations"), corporations which hold no ownership interest in each other, to be held liable for the malfeasance of the other. The linchpin of this theory of liability is that the sister corporations must have a common "parent," which is usually a third corporate entity (often referred to as the "parent corporation"), though conceptually there is no reason why this parent cannot be a common individual stockholder, especially in cases involving groups of closely held sister corporations. *Id.* at 840 n. 12. Judge Eisele also expressed reservations about the viability of triangular piercing stating that the doctrine

... is plainly out of harmony with both the traditional piercing doctrine and the more novel 'reverse piercing' doctrine. These two doctrines are ordinarily applied to overcome the legal separateness between a corporation and its shareholders, see generally 1 William Meade Fletcher, Fletcher Cyclopedia of the Law of Private Corporations §§ 41.20, 41.70 (perm. ed. rev. vol. 1990), while the "triangular piercing" theory allows for liability between corporations that are not stockholders of each other. *Id.*

ceed or not allowed to proceed. The Court analyzes each of those arguments below.

### The Cost and Burden of Litigating in One Forum vs. Two

Naples argues that the burden he faces if forced to litigate in two forums (in Miller County against all the defendants except Debtor and in Bankruptcy Court to establish a claim against Debtor) outweighs any prejudice on the Debtor's estate. Naples further argues that any prejudice to the Southeast Trustee if Naples is allowed to proceed against Debtor in Miller County is illusory in that the Southeast Trustee will likely need to participate in or closely monitor the Miller County Case regardless of the Debtor's status as a defendant there due to the presence of Kimbro and Grundy (who are described by Naples as the Debtor's control persons). Naples also asserts that the Miller County Case would not distract the Southeast Trustee from overseeing the Debtor or attempting to sell it because he admitted that the lawsuit would not affect him personally, that he would delegate the trial to litigators in his law firm, and that selling Chapter 11 Debtors is routine and something he frequently does. Naples also points out that since Grundy is an individual defendant in the Miller County Case, he would be required to participate whether or not the case proceeds against the Debtor in Miller County. Additionally, Naples argues that Grundy would have to participate in both trials, should the case against Debtor proceed in this Court. With respect to the cost of defense, Naples argues that the cost to the estate is insufficient to deny relief from stay, and that in any case, the cost would likely increase if the Debtor is involved in two trials.

The Southeast Trustee argues that Naples has not proven any particular hardship by pursuing his claim against the Debtor in bankruptcy court. The evidence cannot grow further stale; Naples has appeared in Little Rock numerous times in this case and others. The Southeast Trustee further maintains that allowing the Miller County Case to proceed will subject the Debtor's estate to the costs of litigating in Miller County and notes that monitoring a trial is far less costly than actually litigating one.

The Court finds that Naples will be burdened by pursuing his claim against the Debtor in bankruptcy court while separately trying his suit against the other defendants, but that burden does not outweigh the prejudice to this estate and other creditors if required to litigate in Miller County, particularly since the Debtor's value (if successfully sold) may not be high enough to pay any claim Naples may establish. The administrative expenses incurred in defending this litigation would only further deplete estate resources. The Southeast Trustee's participation in the Miller County Case against 12 defendants will undoubtedly be more expensive than litigating Naples's claim in bankruptcy if it is even necessary to do so.

### Burden of Delay

Naples contends the overwhelming evidence of his burden is how long Naples has had to wait to try his claims against the Debtor and others due to their actions—specifically, the bankruptcies of two entities and one individual, an injunction in one case, and two attempted removals to federal court based on bankruptcies, resulting in a delay of over five years. However, as pointed out by the Southwest Trustee, Pinewood did not seek relief from the stay in the Living Hope Southwest case for more than three years. Naples responded that Pinewood was adequately protected during that time and therefore did not move for relief from stay.

Naples's focus on the actions of Debtor and related entities, in filing for bankrupt-

cy and seeking to remove the Miller County suit to federal court paints less than a complete picture. There has been ongoing litigation between the Debtor, the Southwest Trustee, and Pinewood/Naples for eight years now resulting in numerous hearings, trials, and appeals. As this Court has previously noted, litigation stemming from the Miller County Case and subsequent bankruptcies has put these parties and this set of facts before one state court judge, three bankruptcy judges, three district court judges from the Western District of Arkansas, and now an Eastern District Court judge. This Court alone has entered numerous non-routine orders, and conducted 12 substantive hearings, most of which were lengthy. Naples was involved in all but one of those hearings, either as the moving party or an objecting party. While the Debtor and related parties may have brought the action into bankruptcy court, it is not only the bankruptcies that have delayed Naples's lawsuit.

### Impact of Constructive Trust on Other Creditors

Naples argues the impact on other creditors is minimal in that if Naples is successful in Miller County, the other creditors' pro-rata distributions in this bankruptcy case might be reduced (which would happen no matter where Naples's claim is tried) and a constructive trust might be imposed on assets transferred from LHI to the Debtor. Naples does not explain how a constructive trust would have a minimal impact on other creditors, but argues that because the Southwest Trustee was allowed to litigate her claims against the Debtor in another court and also sought a constructive trust on assets

transferred to the Debtor, Naples should be allowed to do so as well.

Citing *United Imports,* both the Southeast Trustee and the Southwest Trustee argue that the imposition of a constructive trust would necessarily impose great hardship on the estate, and that even though Naples states he does not seek to enforce any judgment he obtains in Miller County against the Debtor, it may be legally impossible to keep him from enforcing such a judgment against the Debtor's estate if he in fact obtains a constructive trust in state court. In effect, by allowing relief from the stay for the Miller County Case to proceed, the Miller County Court may determine what is property of the Debtor's estate, and that is, in fact, a core bankruptcy proceeding which should be determined by the bankruptcy court. The Court agrees with this point and with the analysis in *In re Rogan,* 2009 Bankr.LEXIS 2090 (Bankr.N.D.Iowa 2009), cited by the Southwest Trustee, where the court explained, "[b]ecause of its exclusive jurisdiction over § 541(a) property, the bankruptcy court is both statutorily empowered and perhaps statutorily required to retain and exercise control over determinations which affect claims to estate property, and as a result affect distributions to creditors in a bankruptcy case." *Rogan,* at 53.[16] Likewise, in *United Imports,* the bankruptcy court found that allowing a constructive trust to be placed on assets of the Debtor could "greatly prejudice" the bankruptcy estate and also reduce any distribution to other creditors. 203 B.R. at 169. The court noted that constructive trusts were only imposed in bankruptcy under extreme circumstances usually where a

**16.** The Court notes that while Judge Hickey found that the bankruptcy court did not have exclusive jurisdiction over the Miller County Case simply because it was related to the bankruptcy case, Judge Hickey did not specifically analyze the effect of the imposition of a constructive trust on the Debtor's bankruptcy estate. *See Pinewood Enterprises, L.L.C. v. Stephens,* 2012 WL 6049148 (W.D.Ark.2012).

trust is sought on property claimed to be owned by another party. *Id.* (citing *Shubert v. Jeter (In re Jeter),* 171 B.R. 1015, 1020 (Bankr.W.D.Mo.1994), aff'd 178 B.R. 787 (W.D.Mo.1995), aff'd 73 F.3d 205 (8th Cir.1996)). The *United Imports* court also quoted at length from *XL/Datacomp, Inc. v. Wilson (In re Omegas Group, Inc.),* 16 F.3d 1443, 1452–53 (6th Cir.1994) (citations omitted) to explain how constructive trusts unfairly harm other parties in bankruptcy:

> The equities of bankruptcy are not the equities of the common law. Constructive trusts are anathema to the equities of bankruptcy since they take from the estate, and thus directly from competing creditors, not from the offending debtor ... To a party defrauded by the debtor, incorporating the proceeds of fraud in the debtor's estate may seem like allowing the "estate to benefit from property that the debtor did not own." But ... "allowing the estate to 'benefit from property that the debtor did not own' is exactly what the strong-arm powers are about: they give the trustee the status of a bona fide purchaser for value, so that the estate contains interests to which the debtor lacked good title." The Code recognizes that each creditor has suffered disappointed expectations at the hands of the debtor; for this reason, it makes maximization of the estate the primary concern and entitlement to shares of the estate secondary. Imposing a constructive trust on the debtor's estate impermissibly subordinates this primary concern to a single claim of entitlement.
>
> ... To permit a creditor, no matter how badly he was "had" by the debtor, to lop off a piece of the estate under a constructive trust theory is to permit that creditor to circumvent completely the Code's equitable system of distribution.

203 B.R. at 169–70. The *United Imports* court also quoted *Bistate Oil Co. v. Heston Oil Co. (In re Heston Oil Co.),* 63 B.R. 711 (Bankr.N.D.Okla.1986) to illustrate the same point:

> [A constructive trust] serves well to do equity as between trustee and beneficiary, but is obviously a dangerous game to play where innocent third parties ... are involved. As a general rule all parties owed unfulfilled obligations by another, that is the debtor, have as remedy claims for damages enforceable against the debtor's assets; and where debtor's assets are unsufficient (sic) to satisfy all such claims, then the claimant's share, pro-rata, in available assets, each claimant being satisfied or dissatisfied in proportion to his claim. But imposition of a constructive trust ... reserves such assets to the trust beneficiary exclusive of others, enlarging the beneficiary's recovery while reducing the recoveries of other creditors ... [I]mposing such constructive trusts amounts to giving the beneficiary a non-statutory priority over other creditors in distribution of estate assets. *See U.S. v. Randall,* 401 U.S. 513, 91 S.Ct. 991, 28 L.Ed.2d 273 [ (1971) ].

*Id.* at 170–171. *See also In re MJK Clearing, Inc.,* 286 B.R. 109 (Bankr.D.Minn. 2002) ("Although a post-petition constructive trust may be imposed to prevent a fraudulent debtor from being unjustly enriched, FBW has not proven that the circumstances of this case support the imposition of a post-petition constructive trust. The circumstances of this case simply do not rise to a level so egregious as to warrant the disruption of priority schemes.").

This Court previously granted relief from stay to allow Judge Mixon to decide whether or not to impose a constructive trust on the Debtor's assets in the Southwest AP, noting the well-reasoned holding

of *In re MJK Clearing, Inc., supra,* that the imposition of constructive trusts on assets of the estate post-petition is generally not allowed because it disrupts the Bankruptcy Code's priority scheme. As this state's most experienced bankruptcy judge who is intricately familiar with these parties and the prior litigation between them, Judge Mixon was the best-equipped judge to determine whether a constructive trust might be appropriate, and he found it was not.[17] After further study and review of case law, this Court agrees it is not an appropriate remedy in most cases, including this one. The Court also notes that when the relief from stay trial was held on November 27, 2012, to allow the Southwest AP complaint to be filed, there was not a trustee appointed in Debtor's case, and at that time, the Debtor needed to liquidate claims against it in order to propose a plan. The Debtor agreed to litigate those claims in front of Judge Mixon.

Finally, the Southwest Trustee is concerned that should the matter proceed in Miller County, the Debtor's co-defendants will attempt to reach a settlement with Naples that "hangs the Debtor out to dry." Southwest Trustee's Brief at 9. The Southwest Trustee points to the prior consent judgment proposed by and entered into between Greg and Kimbro allowing the Greg Stephens entities a $1.3 million judgment against the Debtor and other codefendants as well as a constructive trust on the Debtor's assets. The Court agrees that there is a substantial risk agreements could be made in state court that put the Debtor's estate at further risk.

### Impact on Trustee's Efforts to Sell

The Southeast Trustee's most persuasive argument against granting relief from stay is that litigating in Miller County will negatively impact the Trustee's process of selling the Debtor to maximize the value of the estate. The Southeast Trustee argues the best way to determine the Debtor's value will be to find a willing buyer. The Southeast Trustee asserts that once the assets are liquidated, it may not be necessary to litigate claims, particularly if estate resources are depleted by paying attorneys to litigate in other forums. More specifically, the Southeast Trustee explains:

> The sale process is the best way to bring closure to the case and preserve estate value. As the Court is aware, the parties in this case have a penchant for protracted litigation. The Trustee asserts that a sale of the company, which converts the operating assets of the Debtor into cash, will allow the parties to know exactly what the value of the company is. This will allow the parties to assess the incremental benefit of continued litigation of the various disputed issues in the case. If the sale brings sufficient cash to pay all claims in full, that should affect the extent of litigation going forward. Likewise, if the sale generates less than an amount necessary to satisfy all claims, the parties will have the benefit of that information in assessing the propriety of continued litigation. In general, when disputes can be reduced to a cash number, the potential for settlement becomes much greater. See July 25 Hr'g Tr., at 175.
>
> By continuing to stay the State Court Action until a sale of the company can be effectuated, the drain on the Debtor's resources will be reduced, the Debtor's operation will be unharmed, value will be preserved, the parties will have better information with which to value their respective claims, and the possibility of a consensual resolution of the claims will be enhanced.

---

17. *See Supplemental Order* (Southwest AP, Dkt. # 130) entered February 6, 2013.

Trustee's Brief at 15. The Trustee's argument is compelling; the Court finds that relief from stay is not appropriate in the circumstances present in this case.

### Conclusion Regarding the Cost and Burdens to Respective Parties

Having carefully considered the parties' arguments with respect to the burdens each will face, the Court finds that while Naples will be burdened by having to pursue his claims against the Debtor separately from his claims against the other defendants, the Debtor's estate and other creditors face a larger burden. Naples seeks a constructive trust on some of Debtor's assets which will disrupt the priority scheme in Debtor's bankruptcy case and negatively impact other creditors. Finally, and most importantly, allowing the Southeast Trustee to move forward with a sale of the Debtor without the distractions of defending the Miller County Case is the best way to bring closure to this case while preserving value for the estate.

### CONCLUSION

At first glance, this appears to be a case where relief from stay should be granted to allow Naples to continue his lawsuit against the Debtor and other defendants. It appears that Kimbro has used various entities to avoid paying Naples, and has successfully used the bankruptcy system to create further delay. However, Naples is not the Debtor's only creditor, and this is not a two-party dispute between Naples and the Debtor, or the Stephenses. Understandably, Naples's goal has been to be paid in full by the Debtor and other Debtor-related persons and entities. Naples seeks to establish liability and distribution to himself based on his view of alleged pre-bankruptcy agreements, obligations, and losses. In contrast, this Court's sole purpose is to ensure that Debtor's obligations to its creditors are established, and its

assets are distributed under principles as codified by the Bankruptcy Code. To achieve that goal, this Court has devoted substantial resources to the studied and informed resolution of all issues raised in this case. Against this background, and after carefully analyzing the complexities presented by this Motion for Relief, the Court denies Naples's request for relief from stay. The Trustee plans to sell the Debtor. Litigation in Miller County will impede that process and will result in increased and possibly wholly unnecessary administrative fees. However, if not encumbered by litigation in Miller County, the Trustee can find a buyer for the Debtor, and the sale amount will establish the value available for distribution. When the amount is known, then litigation should be tempered by the reality of Debtor's monetary value. To force Debtor to litigate in Miller County prior to the determination of its value lacks rationale.

In sum, the best way to bring an end to eight years of litigation between these parties is to allow the court-appointed trustee to market the Debtor, find a buyer, and establish the Debtor's value so the parties can make rational decisions. This is also the only chance of any creditor being fairly paid, which is the goal of the bankruptcy process. To allow Naples to litigate against the Debtor in Miller County will, without doubt, either make Debtor unmarketable or reduce its value substantially. The harm to creditors in allowing relief from stay far exceeds the harm to Naples. While the sale process continues, the danger to creditors of further loss or manipulation is mitigated by the Debtor's ability to continue to generate profits under the control of an independent trustee. The Court will hold periodic status conferences to monitor the progress of the Southeast Trustee's efforts to sell the Debtor to en-

sure that further delays are justified by increased market value.

For these reasons, it is

**ORDERED** that the Motion for Relief is **DENIED;** it is further

**ORDERED** that Naples has 30 days from the date of this Order to file a claim; and it is further

**ORDERED** that a status hearing is set to evaluate the progress of the Southeast Trustee's sale efforts for **March 13, 2014.**

**IT IS SO ORDERED.**